121 T.C. No. 11

UNITED STATES TAX COURT

SQUARE D COMPANY AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6067-97.                    Filed September 26, 2003.

        P was a publicly held U.S. corporation and, after
its acquisition by a foreign corporation (S) through a
reverse subsidiary merger, was a U.S. corporation
indirectly owned by S, during the years in issue.

        To finance the acquisition of P, S obtained a
commitment from two banks to extend loans to a to-be-
organized subsidiary equal to one-half the acquisition
price, not to exceed $1.125 billion.  The subsidiary
was created for the purpose of acquiring P.  It was to
use the loan proceeds to purchase P's outstanding
shares, at which time it would merge into P and cease
to exist.  As consideration for the banks' commitment,
S became obligated to pay the banks a loan commitment
fee and to indemnify the banks for any legal fees
incurred in connection with their agreement to extend
credit for the acquisition.  The subsidiary formally
assumed S's obligations with respect to the banks'
legal fees and became obligated to pay a portion of the
loan commitment fees.  After initially resisting the
acquisition, P agreed to it and as a consequence of the

merger assumed the subsidiary's obligations. P paid the legal fees directly. S invoiced P for the full cost of the loan commitment fee, and P reimbursed S for those costs in a subsequent year.

Held, P is entitled to amortization deductions for its payments for the loan commitment and legal fees because, by virtue of its merger with S's subsidiary, the costs were incurred on P's behalf and eventually paid by P.

In 1990, prior to S's acquisition of P, certain executives of P who were "disqualified individuals" within the meaning of sec. 280G(c), I.R.C., obtained employment agreements (1990 agreements) under which they were entitled, upon a change in ownership or control of P, to certain lump-sum payments if they chose to terminate their employment during the 13th month after the acquisition or if their employment was involuntarily terminated within 3 years of the acquisition. The lump-sum payments would have been parachute payments within the meaning of sec. 280G(b)(2), I.R.C.

S's acquisition of P in May 1991 triggered the executives' rights to the parachute payments under the 1990 agreements. S sought to retain the executives' services for P beyond the 13th month after the acquisition, rather than have the executives terminate their employment at that time to obtain the parachute payments. To that end, S negotiated new employment agreements (1991 agreements) with the executives. The executives used their rights to parachute payments under the 1990 agreements as leverage to secure lump-sum payments under the 1991 agreements. The lump-sum payments provided in the 1991 agreements were larger than the parachute payments and, further, were conditioned on the executives' either remaining in petitioner's employment, or ceasing employment only under specified circumstances, for approximately 3 years through 1994. The 1991 agreements were subsequently amended to accelerate the payment of the lump sums (in a reduced amount) to December 1992 in exchange for an extension of the employment term for an additional year through 1995.

Held, under the facts of this case, the lump-sum payments (excluding a portion conceded by R to be

otherwise) paid under the 1991 agreements as amended, were contingent on a change in ownership or effective control within the meaning of sec. 280G(b)(2)(A)(i), I.R.C., because they would not have been made but for the change in ownership or control. The phrase "contingent on a change in the ownership or effective control" of sec. 280G(b)(2)(A)(i), I.R.C., is interpreted in light of legislative history. Accordingly, the payments are parachute payments for purposes of sec. 280G(b)(2), I.R.C.

Held, further, whether P has established that any portion of the parachute payments was reasonable compensation for purposes of sec. 280G(b)(4)(A), I.R.C., must be determined on the basis of a multifactor test, considering all the facts and circumstances. Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, applying an independent investor test to determine reasonable compensation for purposes of sec. 162(a), I.R.C., distinguished.

Held, further, extent to which P has met burden of showing by clear and convincing evidence that any portion of parachute payments was reasonable compensation within the meaning of sec. 280G(b)(4)(A), I.R.C., determined.

Robert H. Aland, Gregg D. Lemein, Tamara L. Meyer, Oren S. Penn, David G. Noren, John D. McDonald, and Holly K. McClellan, for petitioner.

Lawrence C. Letkewicz and Dana E. Hundrieser, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    Background . . . . . . . . . . . . . . . . . . . . . . . 7

II.   Loan Commitment and Legal Fees Arising From Acquisition of
      Petitioner . . . . . . . . . . . . . . . . . . . . . . . 8
      A.   The Commitment Letter . . . . . . . . . . . . . . . 8
      B.   Takeover Events and Litigation . . . . . . . . . . 10
      C.   Commitment Letter Addendum . . . . . . . . . . . . 12
      D.   The Bridge Loan . . . . . . . . . . . . . . . . . . 13
      E.   The Term Loan . . . . . . . . . . . . . . . . . . . 14
      F.   Payment of the Commitment and Legal Fees . . . . . 15

III.  Executive Compensation . . . . . . . . . . . . . . . . . 15
      A.   Background . . . . . . . . . . . . . . . . . . . . 15
      B.   1990 Employment Agreements . . . . . . . . . . . . 16
      C.   Importance of Schneider's Retaining Petitioner's Key
           Executives . . . . . . . . . . . . . . . . . . . . 20
      D.   Negotiations Between Retained Executives and Schneider
           Over New Employment Agreements . . . . . . . . . . 21
      E.   1991 Employment Agreements . . . . . . . . . . . . 24
      F.   Mr. Garrett's Termination . . . . . . . . . . . . . 29
      G.   The 1992 Amendments . . . . . . . . . . . . . . . . 29
      H.   Other 1992 Compensation of Retained Executives . . 32
      I.   Retained Executives' Pre- and Postacquisition
           Compensation . . . . . . . . . . . . . . . . . . . 34
      J.   Retained Executives' Duties and Responsibilities . 35

IV.   Tax Returns, Notice of Deficiency, and Petition . . . . 36

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.    Loan Commitment and Legal Fees . . . . . . . . . . . . . 37
      A.   The Legal Obligation To Pay the Loan Costs . . . . 40
      B.   Reimbursed Expenses . . . . . . . . . . . . . . . . 45

II.   Parachute Payments . . . . . . . . . . . . . . . . . . . 51
      A.   General Requirements of Section 280G . . . . . . . 52
      B.   Whether Payments Were Contingent on a Change in Control
           . . . . . . . . . . . . . . . . . . . . . . . . . 54
      C.   Reasonable Compensation--Applicable Test . . . . . 65
      D.   Determination of Reasonable Compensation . . . . . 74
           1.   Overview of Expert Testimony . . . . . . . . 74
           2.   Historical Compensation . . . . . . . . . . . 78
           3.   Analysis of Comparables . . . . . . . . . . . 82

a.  Relevant Period for Reasonable Compensation
    Comparison . . . . . . . . . . . . . . . .  82
b.  Aggregate Versus Individual Compensation   86
c.  Retained Executives' 1992 Compensation  .  88
    (i)    Perquisites . . . . . . . . . . . .  89
    (ii)   LTIP Compensation . . . . . . . . .  90
    (iii)  1991 SRP Benefits . . . . . . . . .  93
    (iv)   Summary . . . . . . . . . . . . . .  98
d.  Determination of Comparable Executives and
    Their Compensation  . . . . . . . . . . .  98
    (i)    Selection of Comparable Companies .  99
    (ii)   Selection of Comparable Executives and
           Their 1992 Compensation . . . . . . 101
e.  Range of Reasonable Compensation  . . . . 103
f.  Reasonable Compensation Established for Each
    Retained Executive  . . . . . . . . . . . 106
    (i)    Mr. Brink . . . . . . . . . . . . . 106
    (ii)   Mr. Denny . . . . . . . . . . . . . 109
    (iii)  Mr. Kurczewski  . . . . . . . . . . 112
    (iv)   Messrs. Garrett, Richardson, Thompson,
           and Williams  . . . . . . . . . . . 114
           (aa)  Mr. Garrett . . . . . . . . . 116
           (bb)  Mr. Richardson  . . . . . . . 117
           (cc)  Mr. Thompson  . . . . . . . . 118
           (dd)  Mr. Williams  . . . . . . . . 118
    (v)    Messrs. Francis, Free, Hite, and Pugh
           . . . . . . . . . . . . . . . . . . 118

GALE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes of $7,420,227, $28,971,522, and $15,285,996 for the taxable years 1990, 1991, and 1992, respectively.  Petitioner claims overpayments of $12,486,577 and $18,289 for taxable years 1990 and 1992, respectively.

After concessions, the issues remaining for decision[1] are:

(1)  Whether petitioner may deduct in 1991 a loan commitment fee incurred in connection with the provision of financing for petitioner's acquisition.  We hold that petitioner may.

(2)  Whether petitioner may deduct in 1991 legal fees incurred in connection with the provision of financing for petitioner's acquisition.  We hold that petitioner may.

(3) Whether certain lump-sum payments made by petitioner to senior executives in 1992 and deducted in that year were contingent on a change in the ownership or effective control of petitioner within the meaning of section 280G(b)(2)(A)(i).[2]  We hold that they were.

(4) What part, if any, of the foregoing payments constituted reasonable compensation in 1992 within the meaning of section

---

[1] An additional issue involving the application of sec. 267(a)(3) has been addressed in a separate opinion.  See Square D Co. & Subs. v. Commissioner, 118 T.C. 299 (2002).

[2] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for taxable years 1991 and 1992, and all Rule references are to the Tax Court Rules of Practice and Procedure.

280G(b)(4)(A). We hold that petitioner has established that a portion of the payments was reasonable compensation.

FINDINGS OF FACT

I. Background

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, the first and second supplemental stipulation of facts, and accompanying exhibits.

Square D Co., a Delaware corporation with its principal executive offices in Palatine, Illinois, is the common parent of an affiliated group of corporations making a consolidated return (collectively, petitioner).

Prior to its 1991 acquisition by Schneider S.A. (Schneider), discussed below, petitioner was a publicly held company whose stock was traded on the New York Stock Exchange. During the years in issue, petitioner was engaged in the United States and abroad in the manufacture and sale of electrical distribution and industrial control products. Electrical distribution products included items such as circuit breakers, safety switches, transformers, and surge suppressors; industrial control products included push buttons, relays, control switches, voltage controls, data communication systems, power protection systems, and computerized control and data gathering systems. By 1990,

"Square D" was a well-regarded brand in the electrical equipment industry throughout North America.

During the years in issue, Schneider, a French corporation with its principal executive offices in Paris, France, was, through its subsidiaries, a multinational manufacturer and marketer of electrical distribution and industrial control equipment, among other activities. Schneider owned, directly or indirectly, five major subsidiaries, including Merlin Gerin S.A. (MGSA) and Telemecanique S.A. (TESA), both French corporations.

II.  Loan Commitment and Legal Fees Arising From Acquisition of Petitioner

A.    The Commitment Letter

Around late 1990 or early 1991, Schneider began taking steps to initiate a hostile takeover of petitioner. In this regard, Schneider sought financing from two French banks, Societe Generale and Banque Paribas (collectively, the French banks). The French banks sent Schneider a commitment letter dated February 18, 1991 (Commitment Letter), in which they agreed (subject to various conditions) to (1) provide a "bridge" or temporary loan (Bridge Loan) to a to-be-organized subsidiary for the purpose of acquiring petitioner, equal to one-half of the purchase price of petitioner, up to a maximum of $1 billion; and (2) underwrite permanent financing of one-half of the purchase

price of petitioner, up to a maximum of $900 million (the Term Loan).[3]

As consideration for the French banks' financing commitment, the Commitment Letter required Schneider to pay a nonrefundable loan commitment fee equal to 0.3 percent per annum on $1 billion, payable monthly in advance from the date that receipt of the Commitment Letter was acknowledged by Schneider (February 18, 1991) until the Bridge Loan was disbursed, but no later than December 31, 1991.[4]  The Commitment Letter set forth the basic

---

[3] Schneider and its subsidiaries agreed to provide the remainder of the acquisition price to its acquisition subsidiary in the form of capital contributions and subordinated loans.

[4] The Commitment Letter, addressed to Schneider specifically, stated at section D.(a):

> Your Company shall pay our two Banks * * * a commitment fee of 0.30% * * * per annum payable monthly in advance from the date of acknowledgment of the receipt of their commitment letter until the bridge loan is disbursed on US$ 1,000,000,000 (one billion U.S. dollars), the maximum amount specified for the bridge loan.  Any commitment fee received shall become the property of the Banks.  The receipt of this commitment fee shall cease upon extension of the bridge loan, or not later than December 31, 1991, barring an extension approved by our two Banks and your Group.

The Commitment Letter further provided that "Your Company guarantees that it will have this letter signed by MERLIN GERIN, TELEMECANIQUE [i.e., MGSA and TESA] and S.P.E.P. [Schneider's controlling shareholder]".  In a section entitled "GROUPE SCHNEIDER'S COMMITMENTS", the Commitment Letter stated:

> Your Group (i.e. SCHNEIDER and the subsidiaries subject to consolidation) agrees * * * not to proceed to acquire new interests other than those of * * *

(continued...)

terms of the Bridge and Term Loans, including commitment fees of 0.3 percent per annum on any amounts of the Bridge or Term Loans not disbursed.  Schneider also agreed to indemnify the French banks for any legal fees associated with their agreement to commit funds to Schneider.  A letter from Schneider to the French banks, which the Commitment Letter required, contained the following provision:  "We herewith declare that our Company agrees to indemnify your two Banks * * * as to all the costs, expenses or liabilities or [sic] any kind whatsoever arising from" the credit facility.

The Commitment Letter specified that the Bridge and Term Loans would be made to a Schneider subsidiary that was to be newly organized for the purpose of acquiring petitioner.  Thus, while Schneider obtained the commitment to finance, it never intended to be the borrower.

B.    Takeover Events and Litigation

On February 19, 1991, Schneider submitted to petitioner's

---

[4](...continued)
[petitioner] * * * in net annual amounts greater than its annual consolidated available cash flow.
             *    *    *    *    *    *    *
Your Company guarantees compliance with this provision by all the subsidiaries in which it has a controlling interest * * *
             *    *    *    *    *    *    *
To permit our two Banks to monitor this commitment on the part of your Group, your Company and S.P.E.P. will provide them * * * with all the necessary accounting data.

board of directors a proposal to acquire all outstanding shares of petitioner's stock for $78 per share, or a total purchase price of approximately $2 billion. Petitioner's board of directors rejected the proposal on February 27, 1991, and the next day petitioner filed complaints in Federal District Court and New York State court designed to thwart the Schneider takeover. The French banks were named as codefendants in the Federal complaint.

On February 28, 1991, Schneider, MGSA, and TESA organized Square D Acquisition Co. (ACQ) as a transitory entity to serve as a vehicle for the acquisition of petitioner. Schneider, MGSA, and TESA together owned 100 percent of ACQ. On March 4, 1991, ACQ made a hostile cash tender offer of $78 per share (Tender Offer) to petitioner's shareholders. On March 10, 1991, petitioner's board of directors rejected the Tender Offer as inadequate and recommended that petitioner's shareholders do the same.

On April 12, 1991, petitioner filed a petition with the Board of Governors of the U.S. Federal Reserve System requesting a determination that the role of the French banks in the Tender Offer violated U.S. banking laws and regulations. Banque Paribas incurred legal costs with respect to the petition, as well as the Federal and State actions discussed above.

On April 23, 1991, Schneider indicated it was willing to increase the price of the Tender Offer, and on May 11, 1991, officials of both companies agreed on a price of $88 per share (Revised Tender Offer).  The following day, May 12, petitioner's board of directors approved and recommended to petitioner's shareholders the Revised Tender Offer, which amounted to a total purchase price of approximately $2.25 billion.  Petitioner and Schneider also agreed to dismiss with prejudice (with each party bearing its own costs and litigation expenses) all pending proceedings between petitioner, Schneider, ACQ, and their respective affiliates, including the action filed in Federal District Court naming the French banks as codefendants, the action filed in New York State court, and the petition filed with the Federal Reserve.  That same day (May 12), petitioner, Schneider, and ACQ entered into an Agreement and Plan of Merger (Merger Agreement).

C.    Commitment Letter Addendum

To finance the higher acquisition price in the Revised Tender Offer, Schneider and the French banks executed an addendum to the Commitment Letter on May 13, 1991, in which the French banks agreed to increase the Bridge and Term Loans by an additional $125 million, for a total loan commitment of $1.125 billion, or one-half of the revised acquisition price of $2.25

billion (Commitment Letter Addendum).[5] The Commitment Letter Addendum specifically provided that the conditions enumerated in section D.(a) of the Commitment Letter (i.e., Schneider's obligation to pay loan commitment fee, see supra note 4), applied to the additional funds described in the Commitment Letter Addendum.

D.    The Bridge Loan

On May 30, 1991, the French banks and ACQ (as borrower) entered into the Bridge Loan agreement contemplated by the Commitment Letter.  The French banks agreed to lend ACQ $1.125 billion to purchase petitioner's outstanding shares.  Section 2.2 of the Bridge Loan agreement provided:

> Commitment Fee.  On July 12, 1991, the Borrower [ACQ] agrees to pay to Societe Generale for distribution pro rata to each of the Banks, according to its Commitment, a commitment fee from and including the date of signature hereof [May 30, 1991] to and including July 12, 1991 (or such earlier date as the Total Commitments of the Banks shall have been terminated).  The commitment fee shall be payable in U.S. dollars at the rate of three tenths of one percent (0.30%) per annum on the daily average unutilized amount of the Commitment of the Banks during such period.  * * *

The Bridge Loan Agreement contained no provisions under which ACQ assumed Schneider's obligation to pay a loan commitment fee under the Commitment Letter or by which Schneider was relieved of its

---

[5] Schneider and its subsidiaries agreed to provide the remainder of the acquisition price to ACQ in the form of capital contributions and subordinated loans.

obligation to pay a commitment fee from February 18, 1991 until the Bridge Loan was disbursed.

Regarding the legal fees, the Bridge Loan agreement stated:

The Borrower [ACQ] shall: * * * (iii) indemnify each Bank, its officers, directors, employees, representatives and agents from and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses incurred by any of them arising out of or by reason of any investigation, litigation or other proceeding related to the Acquisition,[6] or the Borrower's or any other party's entering into and performance of this Agreement * * *, including the reasonable fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding * * *

The French banks disbursed the Bridge Loan of $1.125 billion to ACQ on June 12, 1991.[7]

E.    The Term Loan

On August 19, 1991, petitioner signed the Term Loan agreement, and the French banks and a syndicated group of other banks disbursed the funds that same day.  The Term Loan agreement contained language regarding the payment of a commitment fee and legal expenses similar to that contained in the Bridge Loan agreement.  Petitioner used the Term Loan proceeds to repay the Bridge Loan made to ACQ.  Effective August 22, 1991, ACQ merged

---

[6] "Acquisition" was defined in the Bridge Loan agreement as ACQ's acquisition of petitioner's capital and preferred stock pursuant to the offer of purchase, dated Mar. 4, 1991, as supplemented.

[7] ACQ used the proceeds of the Bridge Loan, together with Schneider's capital contributions and subordinated loans, to acquire petitioner's shares pursuant to the Revised Tender Offer.

into petitioner, which assumed ACQ's obligations as the surviving corporation.[8]  Under the terms of the merger, petitioner's shareholders who had not tendered their shares received cash for their shares.  After the merger, Schneider indirectly owned 100 percent of petitioner's shares.

F.    Payment of the Commitment and Legal Fees

Schneider paid a $1,056,020 commitment fee to the French banks and in December 1991 sent an invoice for reimbursement of that amount to petitioner.  In March 1993 petitioner paid $1,056,020 to Schneider as reimbursement.

In August 1991, Rogers & Wells submitted an invoice to Banque Paribas for $699,027 covering services performed and costs incurred in the period of March 21 through July 31, 1991, relating to the litigation and Federal Reserve Board proceedings. Banque Paribas forwarded the Rogers & Wells invoice to Schneider in August 1991 and petitioner paid it in September of that year.

III. Executive Compensation

A.    Background

In December 1990, prior to its acquisition by Schneider, petitioner, as a result in part of concerns about a possible

---

[8] The form of this transaction is typically known as a reverse subsidiary merger.  See Ginsburg & Levin, Mergers, Acquisition, and Buyouts, par. 202, at 2-15 (2002).

hostile takeover, entered into employment agreements (1990 Employment Agreements) with its 18 most senior executives.

For several years prior to the execution of the 1990 Employment Agreements, petitioner's senior executives had received an industry-typical executive compensation package, which included salary, participation in a short-term incentive compensation plan (STIP), restricted stock (including dividends on such stock), nonqualified stock options, and perquisites. The STIP was awarded annually and guaranteed each executive a bonus if certain company performance objectives were met. Petitioner also maintained a supplemental retirement plan (SRP) for certain executives, including the 18 senior executives noted above, who were also participants in petitioner's qualified pension plan. The purpose of the SRP was to provide supplemental retirement benefits to selected key executives.

B.    1990 Employment Agreements

The 1990 Employment Agreements provided for a 3-year employment period that was triggered by a "change of control", defined in the agreements to include the acquisition of 20 percent or more of the common stock or voting power of petitioner. The parties have stipulated that a change of control, both for purposes of triggering the 3-year employment period provided in the 1990 Employment Agreements and for purposes of section 280G(b)(2)(A), occurred on May 29, 1991. The

employment period provided under the 1990 Employment Agreements therefore began on May 29, 1991, and ended on May 28, 1994.

The 1990 Employment Agreements further provided for substantial lump-sum payments to an executive in the event his employment was either terminated by petitioner without cause[9] or by the executive for "good reason". "Good reason" for this purpose included generally any diminution in the executive's preacquisition position or duties, any change in the executive's employment location or required travel, or any failure to be paid the compensation provided in the agreement. The executive's good faith determination regarding whether the elements of "good reason" obtained was conclusive. Further, the 1990 Employment Agreements provided that <u>any</u> reason would be deemed "good reason" during the 30-day period following the first anniversary of the change in control; i.e., May 30 through June 28, 1992 (hereafter, the June 1992 Window). Thus, the 1990 Employment Agreements granted each executive who entered them substantial payments if, during the 3 years after a change in control, the executive (i) was involuntary terminated (without "cause"), (ii) ceased employment voluntarily upon a modification of his duties,

---

[9] "Cause" was defined for this purpose as generally the executive's willful and continued failure to perform his duties with the company or his willful engagement in gross misconduct materially injurious to the company or illegal conduct.

location, or travel burden, or (iii) at his complete discretion, ceased employment during the June 1992 Window.

The payment to which an executive became entitled under the 1990 Employment Agreements upon the occurrence of any of the foregoing contingencies was a lump sum consisting of (a) unpaid annual salary, STIP award, deferred compensation, and vacation pay accrued but not paid through the date of termination, (b) a payment (Termination Award) defined as an amount equal to three times the sum of his annual salary and highest STIP award, and (c) a payment (SRP Cashout) equal to the greater of (i) the present value of his accrued benefits under the SRP or (ii) the present value of a monthly benefit, equal to a percentage of the executive's final average monthly compensation (as defined in the SRP), based on the total of his age and years of service, less the present value of any benefit which the executive was entitled to receive under petitioner's qualified pension plan. Payment of the SRP Cashout would have fulfilled petitioner's obligations to the executive under the SRP.[10]

Seven of the 18 senior executives who were parties to the 1990 Employment Agreements terminated their employment either

---

[10] If the executive's employment was terminated by petitioner for cause or by the executive without good reason during the 3-year employment period, the executive was entitled to receive only accrued but unpaid annual salary, deferred compensation, and certain other benefits; he was not entitled to receive either the Termination Award or the SRP Cashout.

voluntarily or involuntarily in 1991 (or, in one case, 1992) and received the Termination Award and SRP Cashout under the 1990 Employment Agreements.  Petitioner treated these payments as parachute payments for purposes of section 280G.  The remaining 11 senior executives who were parties to the 1990 Employment Agreements (Retained Executives) entered into new employment agreements with petitioner on November 14, 1991 (1991 Employment Agreements), covering their services after that date, which replaced the 1990 Employment Agreements.[11]  The 1991 Employment Agreements are described more fully hereinafter.  The Retained Executives and their pre- and post-control-change titles were as follows:

---

[11] Two Retained Executives did not execute their 1991 Employment Agreements until early 1992.

| Name | Preacquisition Title | Postacquisition Title |
|---|---|---|
| William P. Brink | Corporate vice president, controller | Vice president, chief financial officer and controller |
| Charles W. Denny | Executive vice president, electrical distribution sector | Executive vice president, chief operating officer |
| Philip H. Francis | Corporate vice president, corporate technology center | Vice president, corporate technology and quality |
| Dexter S. Free | Corporate vice president, treasurer and assistant secretary | Corporate vice president, treasurer and assistant secretary |
| John C. Garrett | Executive vice president, industrial sector | Executive vice president, industrial controls |
| Charles L. Hite | Corporate vice president, human resources | Corporate vice president, human resources |
| Walter W. Kurczewski | Corporate vice president, general counsel and secretary | Corporate vice president, general counsel and secretary |
| David L. Pugh | Vice president, general manager, power equipment business | Vice president, general manager, power equipment business unit |
| Chris C. Richardson | Vice president, general manager, utilities business, and president, Anderson Prods. | Vice president, general manager, utilities business |
| Clive N. Thompson | Vice president, distribution equipment business unit | Vice president, distribution equipment business unit |
| Robert D. Williams | Vice president, general manager, transformer business | Vice president, general manager, transformer business |

## C.  Importance of Schneider's Retaining Petitioner's Key Executives

One of Schneider's top priorities after its acquisition of petitioner was to retain key executives of petitioner in order to assure petitioner's continued successful business operations and protect Schneider's $2.25 billion investment.  Schneider had been advised by a management consultant that retaining petitioner's current management would be critical to the company's continued success in the event it was acquired by Schneider.  Moreover, Schneider's management did not believe it could feasibly replace petitioner's existing management team with French executives from

Schneider affiliates or with executives recruited from other U.S. companies in the electrical equipment industry.

D.    Negotiations Between Retained Executives and Schneider Over New Employment Agreements

Schneider's chairman was aware from petitioner's SEC filings that the 1990 Employment Agreements provided for substantial lump-sum payments for several of petitioner's executives if they decided to terminate their employment with petitioner following the 1-year anniversary of petitioner's acquisition by Schneider. He feared that the 1990 Employment Agreements provided incentives for the executives to leave and wanted to devise alternative compensation arrangements that would create incentives for the executives to remain employed by petitioner beyond the first year after the acquisition.

The departure of the Retained Executives during June 1992 would have posed substantial risks to petitioner's continued successful business operations, and Schneider's chairman was prepared to pay a premium in order to keep the Retained Executives.

The 1990 Employment Agreements had a significant impact on Schneider's negotiations with the Retained Executives over new Employment Agreements. An executive compensation consultant retained by Schneider advised it regarding compensation proposals that would "preserve the present value of the parachute payments" to which the Retained Executives were entitled under the 1990

Employment Agreements. The Retained Executives' entitlement to the Termination Awards and SRP Cashouts under the 1990 Employment Agreements gave them additional leverage in their negotiations with Schneider over the terms of their future employment.

From July 23 to July 25, 1991, Schneider's chairman met with the Retained Executives and attempted to convince them to remain in the employment of, and enter into new agreements with, petitioner. The Retained Executives were presented with a compensation proposal containing an "integration long-term incentive plan" (Integration LTIP), which required revocation of the 1990 Employment Agreements and granted a performance award of up to 600 percent of each executive's salary.

The Retained Executives reacted negatively to this proposal, concluding in a July 29 meeting that the proposal attached too much risk to future compensation payments, given the Termination Award and SRP Cashout payments guaranteed to each executive under the 1990 Employment Agreements. As one of the Retained Executives remarked at this meeting: "a bird in the hand is worth two in the bush".

That same day, petitioner's chairman wrote Schneider's chairman explaining that the Retained Executives were disappointed with Schneider's compensation proposal and suggesting that the "golden parachutes" contained in the 1990 Employment Agreements be cashed out as a prerequisite to entering

into new employment contracts with the Retained Executives. Schneider's position, as articulated in a fax sent that day by Schneider's chief financial officer to Schneider's executive compensation consultants, remained that Schneider intended to stick to a proposal that would put "most of the money ahead of [the executives] and not behind them."

The next day, one Retained Executive wrote to Schneider's chief financial officer on behalf of the group, stating that "One way or the other, * * * [the] parachute payments will be paid", and that "Not one officer is willing to give up what they are entitled to under their [1990 Employment Agreement] contract". The letter further stated that "The decision by Schneider is very simple * * * Pay now or pay later."

By August 1, 1991, Schneider had revised its executive compensation plan, but bonus payments under its Integration LTIP, which were intended to compensate the Retained Executives for forgoing their Termination Awards and SRP Cashout, were still based on future company performance. The plan was again revised on August 13, 1991, but the performance component remained. Mr. Hite, a Retained Executive, who had been assigned to negotiate on behalf of the group, continued to meet with Schneider's representatives throughout August and September in an effort to arrive at a mutually acceptable compensation arrangement for periods after 1991. By the beginning of October, Schneider had

agreed to drop the proposal for an Integration LTIP based on future company performance and to develop instead a "retention award" plan tied to the length of future employment.

As originally proposed by Schneider, the retention award plan would have provided each Retained Executive a bonus of 300 percent of base salary plus a 1992 STIP award if that executive remained with petitioner through December 31, 1994. The bonus percentage would have increased to 350 percent if certain company performance objectives were met. As more fully described below, the final agreement reached by Schneider and the Retained Executives provided for awards payable to each Retained Executive based on specified periods of service, without regard to future company performance, but with a minimum or "floor" amount designed to compensate the Retained Executives for the relinquishment of their rights to Termination Awards and SRP Cashouts under the 1990 Employment Agreements.

E.   1991 Employment Agreements

The Retained Executives entered into the 1991 Employment Agreements on November 14, 1991.[12] The 1991 Employment Agreements nullified and replaced the 1990 Employment Agreements.

---

[12] Messrs. Francis and Richardson did not enter new employment contracts until early 1992, but their agreements were essentially the same as the agreements signed by the other Retained Executives. Hereinafter, unless otherwise noted, the term "1991 Employment Agreements" shall include the agreements signed by Messrs. Francis and Richardson in early 1992.

By signing the 1991 Employment Agreements, the Retained Executives surrendered their rights to Termination Awards and SRP Cashouts under the 1990 Employment Agreements.

Petitioner and the Retained Executives had no explicit or implicit legal obligation under the 1990 Employment Agreements or any other agreements to enter into the 1991 Employment Agreements. There were no understandings between Schneider and the Retained Executives prior to the change in control with regard to their continued employment by petitioner after the change in control (other than that contained in the 1990 Employment Agreements).

The 1991 Employment Agreements established a fixed employment period for each Retained Executive from the date of the agreement through December 31, 1994, unless terminated sooner in accordance with the provisions of the agreement. The 1991 Employment Agreements generally increased the 1991 base salaries for each Retained Executive and provided for a 20-percent increase in 1992 base salaries and an annual bonus (i.e., STIP award). The 1991 Employment Agreements also entitled each Retained Executive to participate in a long-term incentive compensation plan (LTIP). The 1991 Employment Agreements further provided that if a Retained Executive remained continuously employed by petitioner until December 31, 1994, he would receive a lump-sum payment (Retention Payment) equal to 3.7 times his

base salary plus targeted STIP award[13] for 1992 and a payment of his supplemental retirement benefits (1991 SRP Benefit) equal to the greater of (a) the SRP Cashout, if any, that would have been payable as of December 31, 1991,[14] under his 1990 Employment Agreement if petitioner had terminated him without cause under his 1990 Employment Agreement on that date, plus interest from December 31, 1991, through the date of payment; or (b) his vested accrued SRP benefit as of the date of termination, in either case reduced by any amount previously paid to the Retained Executive under the SRP. Any 1991 SRP Benefit paid to a Retained Executive would be treated as an offset against any future SRP benefits which that Retained Executive might become entitled to receive. The 1991 SRP Benefit plus interest for each Retained Executive exceeded the amount of his vested accrued SRP benefit on December 31, 1991.

If a Retained Executive's employment was terminated prior to December 31, 1994, either by petitioner without "cause" or by the executive for "good reason", the executive would receive his 1991 SRP Benefit plus interest, and a prorated Retention Payment, computed by multiplying the same base of 1992 salary and STIP

---

[13] The targeted STIP award equaled the STIP award an executive would have received if petitioner achieved, but did not exceed, the financial objectives in its business plan.

[14] In the case of Mr. Richardson, the operative date was Feb. 29, 1992.

award by a multiplier of 2.8 (rather than 3.7) plus 0.005625 for each week of employment completed after November 1991,[15] not to exceed 3.7.[16] "Cause" and "good reason" for purposes of the 1991 Employment Agreements were defined in all material respects as in the 1990 Employment Agreements, except that "good reason" no longer included a change in the executive's travel burden and the executive's good faith determination of "good reason" was no longer conclusive. In addition, there was no comparable provision in the 1991 Employment Agreements to the effect that <u>any</u> reason constituted "good reason" during a specified period.

Under the 1991 Employment Agreements, an executive who terminated his employment for "good reason" (or was dismissed by petitioner without "cause") on the day the agreements took effect would have been entitled to his 1991 SRP Benefit (plus interest) and a prorated Retention Payment computed as the sum of the Retained Executive's base salary and targeted STIP award for

---

[15] For Mr. Francis, the factor equaled 3.0 plus 0.004545 for each week of employment completed after Jan. 17, 1992; for Mr. Richardson, 2.8 plus 0.006294 for each week of employment completed after Mar. 15, 1992.

[16] A Retained Executive whose employment was terminated by petitioner for "cause" or by the executive without "good reason" would forfeit his right to a Retention Payment but not his 1991 SRP benefit, which would be paid to him along with accrued but unpaid annual salary. If he left voluntarily for "good reason" (but not involuntarily for "cause"), he would in addition receive a payment equal to 80 percent of the sum of his salary and target STIP for 1992.

1992, multiplied by a factor equal to 2.8[17] (because the number of weeks worked after the stated date would have been zero). The prorated Retention Payment so payable exceeded the Termination Award to which each Retained Executive would have been entitled under the 1990 Employment Agreements if he had elected to terminate employment with petitioner during the June 1992 Window. A comparison of the Termination Award payable to each Retained Executive under the 1990 Employment Agreements upon a June 1992 elective termination, with the prorated Retention Payment payable at the inception of the 1991 Employment Agreements, follows:

---

[17] For Mr. Francis, the factor would have been 3.0.

|  | Termination Award Payable Under 1990 Employment Agreements | Retention Payment Payable at Inception of 1991 Employment Agreements |
|---|---|---|
| Brink | $699,150 | $910,224 |
| Denny | 1,320,000 | 1,792,000 |
| Francis | 666,600 | 702,000 |
| Free | 646,200 | 837,406 |
| Garrett | 948,939 | 1,137,780 |
| Hite | 853,314 | 1,029,420 |
| Kurczewski | 773,202 | 854,000 |
| Pugh | 635,598 | 812,122 |
| Richardson | 531,000 | 644,448 |
| Thompson | 742,869 | 928,428 |
| Williams | 593,205 | 758,520 |

F.    Mr. Garrett's Termination

Effective December 31, 1992, petitioner terminated the employment of Mr. Garrett without cause and made a prorated Retention Payment and 1991 SRP Benefit payment in December 1992 under the provisions of his 1991 Employment Agreement.

G.    The 1992 Amendments

On December 18, 1992, in anticipation of proposed increases in individual income tax rates and proposed limitations on the deductibility of executive compensation for Federal income tax purposes, petitioner and the Retained Executives (other than Mr. Garrett) executed amendments to the 1991 Employment Agreements (1992 Amendments).  The 1992 Amendments extended the employment period provided by the 1991 Employment Agreements by 1 year, from December 31, 1994, to December 31, 1995, and provided for the early payment of the Retention Payment and 1991 SRP Benefit, on

or before December 31, 1992 (instead of February 1995).  Under the 1992 Amendments, the Retention Payment payable at yearend 1992 was computed as the portion of the Retention Payment that a Retained Executive would have received under the 1991 Employment Agreement if he had terminated his employment for "good reason", or if petitioner had terminated his employment without "cause", on December 31, 1992.  In addition, the 1992 Amendments contained a "clawback" clause, which provided that if a Retained Executive's employment was terminated by petitioner for "cause" or by the Retained Executive for other than "good reason" prior to December 31, 1995, the executive was obligated to repay the entire Retention Payment that he had received in 1992, plus interest.  Finally, the 1992 Amendments provided that petitioner would pay the 1991 SRP Benefit plus interest, as provided in the 1991 Employment Agreements, on or before December 31, 1992.  No "clawback" clause or comparable provision applied to the 1991 SRP Benefit paid under the 1992 Amendments, in the event a Retained Executive's employment ceased prior to the expiration of the employment period on December 31, 1995.

Pursuant to the 1991 Employment Agreements, as amended by the 1992 Amendments, petitioner paid Retention Payments and 1991 SRP Benefits (including interest) to the Retained Executives in December 1992 as follows:

| Retained Executive | Retention Payment | SRP | | | Total Payment |
|---|---|---|---|---|---|
| | | 1991 SRP Benefit | Interest | Total | |
| Brink | $1,014,453 | 0 | 0 | 0 | $1,014,453 |
| Denny | 1,997,200 | $728,977 | $62,468 | $791,445 | 2,788,645 |
| Francis | 703,839 | 358,854 | 30,751 | 389,605 | 1,093,444 |
| Free | 933,297 | 804,477 | 68,937 | 873,414 | 1,806,711 |
| Garrett[1] | 1,268,066 | 406,292 | 34,816 | 441,108 | 1,709,174 |
| Hite | 1,147,298 | 540,333 | 46,302 | 586,635 | 1,733,933 |
| Kurczewski | 982,997 | 367,304 | 31,475 | 398,779 | 1,381,776 |
| Pugh | 969,769 | 0 | 0 | 0 | 969,769 |
| Richardson | 705,290 | 426,642 | 36,560 | 463,202 | 1,168,492 |
| Thompson | 1,108,652 | 0 | 0 | 0 | 1,108,652 |
| Williams | 845,377 | 227,380 | 19,485 | 246,865 | 1,092,242 |
| Total | 11,676,238 | 3,860,259 | 330,794 | 4,191,053 | 15,867,291 |

[1] Mr. Garrett was terminated by petitioner without "cause", effective Dec. 31, 1992, and did not enter into a 1992 Amendment. The figures for him are amounts paid under his 1991 Employment Agreement as a result of his termination in December 1992.

The following table compares the Termination Awards payable under the 1990 Employment Agreements had a Retained Executive elected to terminate employment with petitioner during the June 1992 Window, the prorated Retention Payment payable at the inception of the 1991 Employment Agreements, and the prorated Retention Payment actually paid under the 1992 Employment Agreements (except with respect to Mr. Garrett) in December 1992.

| Retained Executive Amendment | Termination Award Payable Under 1990 Employment Agreement | Retention Payment Payable at Inception of 1991 Employment Agreement | Retention Payment Paid in Dec. 1992 Under 1992 |
|---|---|---|---|
| Brink | $699,150 | $910,224 | $1,014,453 |
| Denny | 1,320,000 | 1,792,000 | 1,997,200 |
| Francis | 666,600 | 702,000 | 703,839 |
| Free | 646,200 | 837,406 | 933,297 |
| Garrett | 948,939 | 1,137,780 | [1]1,268,066 |
| Hite | 853,314 | 1,029,420 | 1,147,298 |
| Kurczewski | 773,202 | 854,000 | 982,997 |
| Pugh | 635,598 | 812,122 | 969,769 |
| Richardson | 531,000 | 644,448 | 705,290 |
| Thompson | 742,869 | 928,428 | 1,108,652 |
| Williams | 593,205 | 758,520 | 845,377 |

[1] For Mr. Garrett, this figure was paid under his 1991 Employment Agreement as a result of his termination in December 1992.

H.    Other 1992 Compensation of Retained Executives

In 1992, the Retained Executives earned, in addition to the Retention Payments and 1991 SRP Benefits paid to them in December, a salary, STIP award, and perquisites.  Also, the 1991 Employment Agreements provided that each Retained Executive was entitled to participate in an LTIP that was to be devised.  The LTIP was finalized, and copies were provided to each Retained Executive, on January 6, 1993.  Certain Retained Executives were actively involved in the development of the LTIP arrangements and received relevant documents, including drafts, during 1992.  The LTIP was designed to motivate petitioner's executives to achieve petitioner's long-term financial objectives.  The LTIP was based on performance over the 3-year period 1992-94, and an award thereunder was equal to a percentage of the sum of a Retained Executive's annual base salary for each year in the period.  LTIP awards were paid in July 1995 for the 1992-94 performance cycle.  A pro rata portion of the LTIP award was generally earned by each Retained Executive in each year of the performance cycle.[18]  The

---

[18] If an executive eligible for an LTIP award left voluntarily before the end of a performance cycle, he would forfeit his award.  If involuntarily terminated, he would receive a partial payment of his award at the discretion of Schneider executives.  If he reached normal retirement age within a cycle, he would receive a pro rata portion of his award.

Mr. Garrett, involuntarily terminated by petitioner effective Dec. 31, 1992, was the only Retained Executive who did not receive an LTIP award in July 1995.  All Retained Executives

(continued...)

compensation earned in 1992 by each Retained Executive is summarized in the following table:

| Retained Executive | Salary | STIP | LTIP[1] | Retention[2] Payment | 1991 SRP Benefit | Interest on 1991 SRP Benefit | Perquisites Allowance | Total |
|---|---|---|---|---|---|---|---|---|
| Brink | $216,720 | $123,748 | $197,400 | $466,616 | 0 | 0 | $89,129 | $1,093,613 |
| Denny | 400,000 | 252,000 | 441,095 | 918,648 | $728,977 | $62,468 | 28,066 | 2,831,254 |
| Francis | 156,000 | 71,136 | 115,737 | 351,023 | 358,854 | 30,751 | 33,738 | 1,117,239 |
| Free | 213,624 | 97,413 | 233,926 | 429,287 | 804,477 | 68,937 | 18,152 | 1,865,816 |
| Garrett | 270,900 | 154,413 | 0 | 1,268,066 | 406,292 | 34,816 | [3]37,753 | 2,172,240 |
| Hite | 245,100 | 139,953 | 220,030 | 527,720 | 540,333 | 46,302 | 25,088 | 1,744,526 |
| Kurczewski | 210,000 | 119,910 | 188,278 | 452,147 | 367,304 | 31,475 | 27,707 | 1,396,821 |
| Pugh | 207,174 | 118,090 | 95,388 | 480,977 | 0 | 0 | 91,009 | 992,638 |
| Richardson | 159,833 | 72,884 | 120,629 | 360,251 | 426,642 | 36,560 | 14,845 | 1,191,644 |
| Thompson | 236,844 | 135,001 | 205,127 | 549,858 | 0 | 0 | 18,918 | 1,145,748 |
| Williams | 193,500 | 88,236 | 148,665 | 388,846 | 227,380 | 19,485 | 14,180 | 1,080,292 |

[1] Prorated (1/3) portion of LTIP paid in 1995 with respect to services rendered during 1992-94, except with respect to Mr. Pugh, whose LTIP covered 1992 and 1993 only, and is therefore prorated one-half to 1992.

[2] Portion of the total Retention Payment paid in 1992 that was deducted by petitioner in that year. Petitioner concluded that deduction of the remainder of the Retention Payment paid to each Retained Executive (except Mr. Garrett) should be deferred under sec. 461(a) and (h) until economic performance occurred in 1993, 1994, and 1995.

[3] Includes $20,838 in accrued vacation pay.

After receiving their Retention Payments in December 1992, four of the Retained Executives (Messrs. Francis, Free, Pugh, and Thompson) ceased employment with petitioner before the expiration on December 31, 1995, of the employment period provided in the 1991 Employment Agreements as modified by the 1992 Amendments. None of the four was required to repay any portion of the Retention Payment under the "clawback" clause of the 1992 Amendments, because their employment was not terminated by petitioner for "cause" or by them for other than "good reason".

_____

[18](...continued)
(except Mr. Garrett) received LTIP awards in July 1995. Mr. Pugh, terminated effective Apr. 15, 1994, received an LTIP covering the years 1992 and 1993.

I.  Retained Executives' Pre- and Postacquisition
    Compensation

The total compensation earned by each Retained Executive in

1990 is summarized in the following table:

| Retained Executive | Salary | STIP | Restricted Stock | Restricted Stock Dividend | Nonqualified Stock Options | Perquisite Allowance | Total |
|---|---|---|---|---|---|---|---|
| Brink | $56,061 | $22,229 | $40,969 | 0 | $178,969 | $25,872 | $324,100 |
| Denny | 275,151 | 93,333 | 44,620 | $18,136 | 259,200 | 6,940 | 697,380 |
| Francis | 141,115 | 37,445 | 16,490 | 1,556 | 160,859 | 43,709 | 401,174 |
| Free | 150,601 | 41,803 | 19,400 | 8,605 | 166,602 | 12,748 | 399,759 |
| Garrett | 191,832 | 61,170 | 24,250 | 6,875 | 165,788 | 6,185 | 456,100 |
| Hite | 180,161 | 59,543 | 30,070 | 11,359 | 212,113 | 12,132 | 505,378 |
| Kurczewski | 154,054 | 53,195 | 26,190 | 10,716 | 207,946 | 10,936 | 463,038 |
| Pugh | 120,853 | 55,521 | 10,670 | 3,528 | 10,670 | 3,789 | 205,031 |
| Richardson | 138,863 | 35,000 | 9,700 | 3,586 | 9,700 | 21,643 | 218,492 |
| Thompson | 171,851 | 56,592 | 22,310 | 4,899 | 171,675 | 71,147 | 498,474 |
| Williams | 102,420 | 54,062 | 10,670 | 3,072 | 10,670 | 1,425 | 182,320 |

In 1991, the Retained Executives received various forms of

compensation under the 1990 Employment Agreements, including

stock options, restricted stock and payments in lieu thereof, as

a result of provisions in the 1990 Employment Agreements

triggered by the change in control of petitioner.  This

compensation totaled, in the aggregate for the 11 Retained

Executives, $8,752,996.  In addition, the Retained Executives

received "gross up" payments in 1991, totaling $2,143,946,

designed to compensate them for any imposition on them of the

section 4999 excise tax on parachute payments with respect to the

aforementioned stock-related payments.

J.    Retained Executives' Duties and Responsibilities

The Retained Executives were competent in their positions, had considerable management experience, worked well together as a management team, and were major contributors to the successful operations of petitioner.  Under the 1991 Employment Agreements, the Retained Executives had greater responsibilities, duties, and authority than they had under the 1990 Employment Agreements.

In 1992, the Retained Executives were managing a company that had undergone a leveraged buyout and undertaken substantial debt obligations.  Consequently, they had to rapidly develop a cashflow orientation in running petitioner's business and raise cash by selling certain assets that did not fit within petitioner's core business of electrical equipment manufacturing. The departure of Mr. Stead, petitioner's most senior executive, shortly after petitioner's acquisition by Schneider increased the pressure on the Retained Executives.  Furthermore, due to a recession in the United States, the Retained Executives were faced with the additional burden of managing a highly leveraged business in an unfavorable economic climate.  In addition, the Retained Executives had to integrate petitioner's North American and European operations with those of Schneider and its other affiliates.  Finally, petitioner's competitors began lowering their prices in an effort to take petitioner's market share, forcing petitioner to aggressively price its own products and

placing an additional burden on the Retained Executives.  Despite these challenges, petitioner met its business plan for 1992.

IV.  Tax Returns, Notice of Deficiency, and Petition

On its 1992 Federal income tax return, petitioner claimed a deduction for $10,384,490 of the aggregate $15,867,291 in Retention Payments and 1991 SRP Benefits paid to the Retained Executives in December 1992.  (See supra p. 31 table.) Petitioner concluded that the $5,482,801 balance of such payments should be deferred under section 461(a) and (h) until economic performance occurred in 1993, 1994, and 1995.  In a notice of deficiency, respondent determined that $7,586,105 of the deduction claimed in 1992 should be disallowed as excess parachute payments under section 280G.

On its 1991 Federal income tax return, petitioner claimed a deduction under section 162(a) for the $699,027 it paid to Rogers & Wells for the firm's services to Banque Paribas in connection with the litigation surrounding the acquisition of petitioner by Schneider.  In the notice of deficiency, respondent determined that this deduction should be disallowed.

Petitioner did not claim a deduction on its 1991 return for the $1,056,020 it paid to Schneider as reimbursement for Schneider's 1991 payment of the loan commitment fees.  In an amendment to its petition, petitioner asserted entitlement to a deduction in 1991 for the foregoing amount.  In his answer to the

amended petition, respondent denied petitioner's entitlement to the deduction.

## OPINION

### I.   Loan Commitment and Legal Fees

In its amended petition, petitioner asserted entitlement to a deduction in 1991 for the $1,056,020 that Schneider billed petitioner that year to reimburse Schneider for paying the loan commitment fee.[19]   Also, petitioner claimed a deduction on its 1991 return for legal fees it paid to Rogers & Wells in that year.   Respondent disputes petitioner's entitlement to both.

As a preliminary matter, we note that respondent has not suggested that these costs are typical acquisition costs, which must be capitalized as costs of the asset acquired.   See, e.g., INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 105 T.C. 166 (1995), revd. and remanded 119 F.3d 482 (7th Cir. 1997).   Petitioner asserts that the costs at issue are loan acquisition costs, which are capitalized as the cost of the loan and may be amortized over the life of the loan to which they relate.[20]   See Anover Realty

---

[19] Petitioner paid Schneider's invoice in 1993.

[20] We note that, to the extent the loan commitment fee and related legal fees are treated as petitioner's costs, they might be considered stock reacquisition costs, the deduction of which is generally prohibited under sec. 162(k)(1).  However, sec. 162(k) expressly distinguishes between "amounts properly allocated to indebtedness and amortized over the term of such

(continued...)

Corp. v. Commissioner, 33 T.C. 671 (1960) (loan acquisition costs amortized over the life of a loan, regardless of the loan's purpose or use of funds); Rev. Rul. 81-160, 1981-1 C.B. 312, 313.[21] Respondent does not dispute this assertion; instead, respondent's sole argument is that the loan costs at issue are Schneider's, not petitioner's, and accordingly petitioner may not deduct them.[22] Thus, the question before us is whether a

---

[20](...continued)
indebtedness" and other stock reacquisition costs, exempting the former from the prohibition on deductions. Sec. 162(k)(2)(A)(ii); see Fort Howard Corp. v Commissioner, 107 T.C. 187 (1996), supplementing 103 T.C. 345 (1994). We assume the amounts at issue would be exempted from sec. 162(k)(1)'s restrictions; in any event, neither party has raised this issue.

[21] Rev. Rul. 81-160, 1981-1 C.B. 312, 313, states in pertinent part:

> A loan commitment fee in the nature of a standby charge is an expenditure that results in the acquisition of a property right, that is, the right to the use of money. Such a loan commitment fee is similar to the cost of an option, which becomes part of the cost of the property acquired upon exercise of the option. Therefore, if the right is exercised, the commitment fee becomes a cost of acquiring the loan and is to be deducted ratably over the term of the loan. See Rev. Rul. 75-172, 1975-1 C.B. 145, and Francis v. Commissioner, T.C.M. 1977-170. If the right is not exercised, the taxpayer may be entitled to a loss deduction under section 165 of the Code when the right expires. See Rev. Rul. 71-191, 1971-1 C.B. 77.

[22] Petitioner asserts the loan costs in question are deductible in 1991, as opposed to amortizable over a longer period, because they relate solely to the Bridge Loan, which lasted fewer than 12 months during 1991. Respondent does not contest this assertion or otherwise suggest that the payments
(continued...)

subsidiary corporation may deduct the costs of obtaining a loan for which it is the borrower (through an assumption of its merger partner's obligations), where its parent procured the loan commitment and originally committed to pay those costs.

Petitioner makes three arguments to support its entitlement to these deductions:  (1) That under the terms of the Commitment Letter and the Bridge Loan agreement, petitioner, as successor to ACQ, was obligated to pay the commitment fee and the legal fees, and therefore may deduct them; (2) that as the borrower of the Bridge Loan, petitioner (as successor to ACQ) is entitled to deduct the costs associated with obtaining the loan; and (3) that even if the costs were Schneider's, petitioner is entitled to deduct them because they directly benefited petitioner. Respondent disagrees, asserting that petitioner was not legally obligated to pay the loan commitment or legal fees under the Commitment Letter or the Bridge Loan agreement, and that Schneider, rather than petitioner, benefited from the loan commitment fee.

As discussed more fully below, we conclude that Schneider incurred the costs in question on behalf of petitioner and that petitioner is entitled to deduct such costs.

---

[22](...continued)
should be amortized over a period that includes the life of the Term Loan.  We shall therefore treat these payments as deductible in 1991, if they are deductible by petitioner.

A.    The Legal Obligation To Pay the Loan Costs

Respondent contends that the critical question concerns who is legally obligated to pay the loan acquisition costs. Petitioner disputes this, but asserts it was so obligated.  Thus, we begin by considering whether petitioner or Schneider was legally obligated to pay the commitment and legal fees in question.  In the case of the commitment fee owed under the Commitment Letter, it is clear Schneider alone was obligated. The Commitment Letter obligated Schneider to pay the fee up until the Bridge Loan was funded.  The Commitment Letter, which was addressed to Schneider, states in relevant part:

> Your Company shall pay our two Banks * * * a commitment fee of * * * [stated terms] * * *  The receipt of this commitment fee shall cease upon * * * [stated circumstances] * * * barring an extension approved by our two Banks and your Group.  [Emphasis added.]

We find that "Your Company" refers to Schneider, the addressee of the letter.  Petitioner argues that the words "Your Company" refer to Schneider and its affiliates, and that the reference at the end of the paragraph to "your Group" supports a finding that the two terms are used interchangeably.  However, while the Commitment Letter does not define the term "Your Company", it does parenthetically clarify the meaning of "Your Group" as "(i.e., SCHNEIDER and the subsidiaries subject to consolidation)".  Moreover, the Commitment Letter provides at one

point "Your Company guarantees that it will have this letter signed by MERLIN GERIN [i.e., MGSA], TELEMECANIQUE [i.e., TESA]" and at another "Your Company guarantees compliance with this provision by all the subsidiaries in which it has a controlling interest", indicating that "Your Company" does not include Schneider subsidiaries.  Finally, in the section entitled "GROUPE SCHNEIDER'S COMMITMENTS", the Commitment Letter states

> Your Group agrees * * * not to proceed to acquire new interests other than those of [petitioner] * * * in net annual amounts greater than its annual consolidated available cash flow.

> \* \* \* \* \* \* \*

> To permit our two Banks to monitor this commitment on the part of your Group, your Company and S.P.E.P. will provide them * * * with all the necessary accounting data.

This further demonstrates "Your Company" and "Your Group" are not interchangeable terms.  Moreover, ACQ had not been created at the time the Commitment Letter was signed (it was organized 10 days later), and although it is referenced as NEWCO in the Commitment Letter, no provision requires NEWCO to pay the commitment fee.  Finally, although ACQ was created well before the Commitment Letter was amended to increase the loan commitment to $1.125 billion on May 13, 1991, the amendment does not obligate ACQ to pay the commitment fee.  We conclude that Schneider, not petitioner, was obligated to pay the commitment fee due under the Commitment Letter.

When the Bridge Loan agreement was signed (on May 30, 1991), ACQ agreed to pay a commitment fee on any funds not disbursed. The fee was set at the same level as the fee in the Commitment Letter. Nothing in the Bridge Loan agreement obligated ACQ to assume Schneider's obligation to pay the fee under the Commitment Letter, nor did the Bridge Loan agreement expressly relieve Schneider of its obligation under the Commitment Letter to pay a commitment fee until the funds were disbursed. Thus, from May 30, when the Bridge Loan agreement was signed, until June 12, when the Bridge Loan was disbursed, both ACQ (under the Bridge Loan agreement) and Schneider (under the Commitment Letter) were legally obligated to pay a commitment fee equal to 0.3 percent of the undisbursed funds.[23]

Respondent asserts he is challenging only the commitment fee incurred by Schneider under the Commitment Letter; i.e., the fee provided in the Commitment Letter covering the period from February 18 through June 12, 1991. Thus, respondent contends, he is not challenging the deduction of any fees owed under the Bridge Loan agreement (for which ACQ was the obligor). We disagree. Since both Schneider and ACQ were obligated for a commitment fee equal to 0.3 percent of undisbursed funds for the

---

[23] The Term Loan also provided for a commitment fee to be paid with respect to any undisbursed funds, but none was paid because execution of the loan documents and disbursement occurred on the same day.

period from May 30 to June 12, 1991, and the $1,056,020 at issue represents the fee owed from February 18 through June 12, 1991,[24] the amount at issue covers periods where Schneider alone was legally obligated to pay, and a brief period where both Schneider and ACQ were obligated to pay. Thus, the commitment fee respondent has challenged includes amounts for which ACQ, as well as Schneider, was obligated.

In the case of the legal fees, the question of who was obligated to pay them is more difficult. It is clear that Schneider was initially obligated to pay the legal fees. A letter from Schneider to the French banks, which was required by the Commitment Letter, contains the following provision: "We herewith declare that our Company agrees to indemnify your two Banks * * * as to all costs, expenses or liabilities or [sic] any kind whatsoever arising from" the Bridge Loan. As with the Commitment Letter itself, we find that "our Company" refers to Schneider; thus, Schneider was initially obligated.

The Bridge Loan agreement, on the other hand, provides as follows:

---

[24] There has been no suggestion that Schneider and ACQ each owed separate 0.3 percent loan commitment fees with respect to the same undisbursed funds. Thus, unless the banks charged no commitment fee under the Bridge Loan agreement, or charged a separate fee that does not appear in the record, the $1,056,020 at issue would appear to include payments made under both the Commitment Letter and Bridge Loan agreement.

The Borrower [ACQ] shall * * * indemnify each Bank * * * and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses incurred by any of them arising out of or by reason of any investigation, litigation or other proceeding related to the Acquisition, or the Borrower's or any other party's entering into and performance of this Agreement * * * including the reasonable fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding; * * *

Although it is clear from the language presented here that ACQ, and later petitioner as ACQ's successor, was obligated, it is not clear whether petitioner was obligated for fees incurred by Schneider <u>before</u> the Bridge Loan agreement was signed, or only fees incurred <u>from the date of</u> the Bridge Loan agreement <u>forward</u>. While it would have been clearer had the agreement specifically identified past costs, the phrase "related to the Acquisition" contains no temporal limitations[25] and is reasonably read to cover all costs, including those costs incurred while the takeover attempt was hostile. Respondent has provided no evidence or argument to suggest a different reading, and we accordingly find ACQ assumed responsibility to pay the legal costs associated with the Commitment Letter.

Thus, Schneider was originally obligated to pay both the commitment fee and legal fees at issue. Schneider caused ACQ

---

[25] The Bridge Loan agreement defined "Acquisition" as the ACQ's acquisition of petitioner's capital and preferred stock pursuant to the offer of purchase, dated Mar. 4, 1991, as supplemented.

(and consequently petitioner) to become legally obligated to pay some of the commitment fee and all of the legal fees. At the same time, Schneider, which was originally responsible for both, was not absolved of its responsibility.

While we conclude that Schneider, and not petitioner, bore the legal obligation to pay most of the commitment fee and originally bore the obligation for the legal fees, this is not dispositive of whether petitioner is entitled to deduct these amounts. As more fully discussed below, a corporation may in certain circumstances deduct expenditures incurred on its behalf by a shareholder, where it makes reimbursement.

B. Reimbursed Expenses

As a general matter, a taxpayer may not deduct payments voluntarily made on another's behalf, even where there is a moral obligation to do so. Williams v. Commissioner, T.C. Memo. 1960-19. Indeed, this is true even where the cost would have been deductible had the taxpayer incurred it. Id. Moreover, corporations generally may not deduct payments made that discharge shareholder obligations. Justice Steel, Inc. v. Commissioner, T.C. Memo. 1980-466.

Petitioner advances two arguments to support its contention that legal obligation does not control under these facts. First, petitioner argues that the costs associated with obtaining a loan are deductible by the person who receives the loan proceeds.

Petitioner asserts it is the borrower of the Bridge Loan, as the successor to ACQ. Petitioner relies on Rev. Rul. 81-160, 1981-1 C.B. 312, which holds that a loan commitment fee constitutes a cost of acquiring a loan and therefore must be deducted ratably over the term of the loan, revoking an earlier ruling that permitted a full deduction in the year paid. The issue at hand, however, is who may deduct a loan commitment fee where the person who procures the loan commitment is different from, albeit related to, the borrower. Rev. Rul. 81-160, supra, offers little guidance on that score.

Petitioner's second argument is that it should be allowed to deduct the expenses because it "directly benefited" from the payment thereof. Petitioner relies on Lohrke v. Commissioner, 48 T.C. 679 (1967), and similar cases for this proposition.[26] In

---

[26] In all, petitioner cites 14 cases, including Lohrke v. Commissioner, 48 T.C. 679 (1967); Fall River Gas Appliance Co. v. Commissioner, 42 T.C. 850, 857-858 (1964), affd. 349 F.2d 515 (1st Cir. 1965); Snow v. Commissioner, 31 T.C. 585 (1958); Fishing Tackle Prods. Co. v. Commissioner, 27 T.C. 638 (1957); Dinardo v. Commissioner, 22 T.C. 430 (1954); L. Heller & Son, Inc. v. Commissioner, 12 T.C. 1109, 1112 (1949); Scruggs-Vandervoort-Barney, Inc. v. Commissioner, 7 T.C. 779, 785-788 (1946); Robert Gaylord, Inc. v. Commissioner, 41 B.T.A. 1119 (1940); Miller v. Commissioner, 37 B.T.A. 830 (1938); First Natl. Bank of Skowhegan, Maine v. Commissioner, 35 B.T.A. 876 (1937); Cepeda v. Commissioner, T.C. Memo. 1993-477, affd. without published opinion 56 F.3d 1384 (5th Cir. 1995); Coulter Elecs., Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318 (11th Cir. 1991); Tex. & Pac. Ry. Co. v. Commissioner, a Memorandum Opinion of this Court dated Mar. 25, 1943; and Shasta Water Co. v. Commissioner, a Memorandum
(continued...)

opposition, respondent asserts petitioner did not benefit from the expenditures.  Rather, he asserts Schneider alone benefited from the commitment and legal fees.

First, as a factual matter, petitioner did benefit from Schneider's procuring the loan commitment.  While ACQ did not exist when the Commitment Letter was signed, it was identified in the letter as the borrower.  It was organized soon after and received the Bridge Loan proceeds.  As the recipient of those funds, ACQ was clearly benefited by the banks' commitment, as was petitioner, as the surviving entity after its merger with ACQ.  Schneider benefited as well, because the commitment to provide financing enabled it to achieve its business goal of acquiring petitioner, but Schneider's benefit was not exclusive. Moreover, while petitioner may initially have been hostile, and some of the costs at issue arose because of petitioner's hostility, petitioner eventually approved the transaction.  Petitioner stands in the shoes of ACQ, which benefited from the loan by virtue of its receipt and use of the loan proceeds.  Thus, even though some of the loan costs may have been incurred because petitioner was initially hostile, petitioner ultimately obtained and used the loan proceeds through its merger with ACQ.

---

[26](...continued)
Opinion of the Board of Tax Appeals dated Feb. 6, 1942.

More to the point, however, petitioner's reliance on the Lohrke line of cases and respondent's counter argument regarding who benefited are misplaced because mere benefit is, in general, not dispositive regarding deductibility.[27]  While it is true that Lohrke and like cases allow a taxpayer to deduct expenses that are the legal obligation of another where the taxpayer benefits, this exception has been construed narrowly.  Under Lohrke and similar cases, it is not the character of the expense as benefiting the taxpayer that renders it deductible.  Rather, it is the circumstances surrounding the payment of the expense.  Where the taxpayer can show that the payment of another's expense protected or promoted its own business, then such payment gives rise to a deduction under Lohrke and like cases.  Typically in these circumstances, the original obligor is unable to make payment, and the taxpayer satisfies the obligation to protect or promote its own interests.  See Hood v. Commissioner, 115 T.C. 172, 180-181 (2000), and cases cited therein.  Petitioner has made no such showing here.  There is no suggestion that Schneider

---

[27] Respondent's argument regarding who benefited from the loan commitment and legal fees suggests the question of whether petitioner's payment of these costs should be considered a constructive dividend to Schneider, and therefore not deductible by petitioner.  Cf. Hood v. Commissioner, 115 T.C. 172 (2000) (where controlling shareholder is primary beneficiary of corporate expenditure, such expenditure is constructive dividend not deductible by corporation).  However, respondent has not raised this issue, and we accordingly decline to consider it.

was unable to pay the loan commitment or legal fees or that petitioner's failure to pay would have adversely affected petitioner; indeed, Schneider remained legally obligated, and it initially paid the loan commitment fee.

Nonetheless, we agree with petitioner that legal obligation is not dispositive and conclude that the loan commitment and legal fees are deductible by petitioner because Schneider incurred those costs on behalf of ACQ, and by extension petitioner, so that petitioner could obtain the Bridge Loan. The facts and holding of Waring Prods. Corp. v. Commissioner, 27 T.C. 921 (1957), are instructive. The taxpayer was a corporation organized to hold and exploit certain patents. It attempted to enter into a contract with a manufacturer to assemble and ship its patented products, but the manufacturer refused because of the taxpayer's poor credit rating. To aid the taxpayer, a major corporate shareholder, who later acquired all the taxpayer's stock, becoming its parent, agreed to enter into a contract directly with the manufacturer, "pledging its own credit on behalf of" the taxpayer. Id. at 924. The manufacturer at first invoiced the shareholder, but later the taxpayer, for the finished products, and the taxpayer made all payments on the invoices. The shareholder, however, was never relieved of its obligations to the manufacturer under the contract.

A dispute arose under the contract, wherein the manufacturer sought recovery of certain production costs. The dispute was ultimately settled by the taxpayer's transfer of property to the manufacturer. The taxpayer sought to deduct the value of the property transferred to settle the dispute, but the Commissioner argued the amount was not deductible because the taxpayer was not legally obligated to make the transfer. We rejected the Commissioner's argument, stating:

> We know of no requirement that there must be an underlying legal obligation to make an expenditure before it can qualify as an 'ordinary and necessary' business expense under section 23(a)(1), Internal Revenue Code of 1939. The basic question is whether, in all the circumstances, the expenditure is ordinary and appropriate to the conduct of the taxpayer's business. * * * [Id. at 929.]

Thus, it was immaterial that whatever legal obligation might exist was the shareholder's, as opposed to the taxpayer's.

The facts here are quite similar to those in Waring Prods. Corp. ACQ was in no position to obtain a loan. Accordingly, Schneider negotiated a loan commitment and agreed to pay loan commitment and legal fees on behalf of its to-be-organized subsidiary ACQ. After ACQ's creation, petitioner, as the surviving entity after its merger with ACQ, formally assumed some of the costs (the legal fees), which it paid directly, and agreed to (and did) reimburse Schneider for other costs (the commitment fee) in response to Schneider's invoice. Thus, the costs at

issue here relate to an asset--the loan--that petitioner obtained, much as the expenditures in <u>Waring Prods. Corp.</u> related to services performed for the taxpayer, albeit under a contract to which the taxpayer was not a party.  Under the circumstances of this case, where the loan acquisition costs were incurred on behalf of petitioner and then paid by petitioner, it is appropriate to allow petitioner to deduct the costs it paid.

II.  <u>Parachute Payments</u>

Respondent disallowed $7,586,105 of the deduction claimed by petitioner in 1992 with respect to the Retention Payments and 1991 SRP Benefits paid to the Retained Executives in that year, on the grounds that this amount constituted "excess parachute payments" within the meaning of section 280G.[28]  After concessions, the parties dispute two issues underlying respondent's determination.  First, the parties dispute whether

---

[28] On brief, respondent concedes that a portion of the 1991 SRP Benefits was not contingent on a change in control within the meaning of sec. 280G(b)(2)(A)(i) on the grounds that it falls within a safe harbor provided in sec. 1.280G-1, A-24(c), Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5, 1989), because payment of that portion was substantially certain, regardless of the change in control, if the Retained Executives continued to work for petitioner until the vesting of their rights to these payments.  Further, the parties have stipulated that the interest component of the 1991 SRP Benefits is deductible by petitioner under sec. 163 in 1992 and does not constitute a "parachute payment" within the meaning of sec. 280G.  For convenience, we hereinafter refer to the portion of the 1991 SRP Benefits whose deductibility remains in dispute as the "disputed 1991 SRP Benefits" and the portion conceded by respondent as deductible as the "noncontingent 1991 SRP Benefits".

the Retention Payments and the disputed 1991 SRP Benefits were "contingent on a change in the ownership or effective control" of petitioner within the meaning of section 280G(b)(2)(A)(i)(I). Second, the parties disagree about the extent to which petitioner has established that the foregoing amounts constitute reasonable compensation within the meaning of section 280G(b)(4)(A).

A.   <u>General Requirements of Section 280G</u>

In general terms, section 280G disallows a deduction for any payment in the nature of compensation to certain individuals performing services for a corporation (i) if the payment is contingent on a change in ownership or control of the corporation, (ii) if and to the extent the payment exceeds three times the individual's annual compensation in periods preceding the change in control, and (iii) if and to the extent the payment has not been shown by the taxpayer to constitute reasonable compensation for services rendered before or after the change in ownership or control.

More specifically, section 280G(a) disallows a deduction for any "excess parachute payment", defined in section 280G(b)(1) as "an amount equal to the excess of any parachute payment over the portion of the base amount allocated to such payment." "[P]arachute payment", as relevant to the instant case, is defined in section 280G(b)(2)(A) as follows:

(A) In general.--The term "parachute payment" means any payment in the nature of compensation to (or for the benefit of) a disqualified individual if--

(i) such payment is contingent on a change--

(I) in the ownership or effective control of the corporation, or

(II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount.

For purposes of clause (ii), payments not treated as parachute payments under paragraph (4)(A) * * * [i.e., section 280G(b)(4)(A), regarding reasonable compensation, set out below] shall not be taken into account.

As provided in the foregoing flush language, the amount treated as a "parachute payment" (and therefore also an "excess parachute payment") does not include the portion of a contingent-on-control-change payment that the taxpayer proves is reasonable compensation, as provided in section 280G(b)(4)(A):

(4) Treatment of amounts which taxpayer establishes as reasonable compensation.--In the case of any payment described in paragraph (2)(A) [i.e., section 280G(b)(2)(A), set out above]--

(A) the amount treated as a parachute payment shall not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is reasonable compensation for personal services to be

> rendered on or after the date of the change
> described in paragraph (2)(A)(i) * * *

The parties agree that the Retention Payments and 1991 SRP Benefits that petitioner deducted and respondent disallowed were in the nature of compensation to disqualified individuals within the meaning of section 280G(b)(2)(A).  The parties also agree as to the "base amount" under section 280G for each Retained Executive.  The parties disagree, and we must decide, whether the Retention Payments and the disputed 1991 SRP Benefits were contingent on a change in ownership or control within the meaning of section 280G(b)(2)(A)(i) and, if so, whether any portion of such payments constituted reasonable compensation for personal services rendered after[29] the change in control, within the meaning of section 280G(b)(4)(A).

B.  Whether Payments Were Contingent on a Change in Control

Respondent contends that the Retention Payments and the disputed 1991 SRP Benefits were contingent on a change in petitioner's ownership or control within the meaning of the statute; petitioner contends that the payments in question were not so contingent because they were made pursuant to an agreement

---

[29] The statute also provides that the amount treated as an excess parachute payment shall be reduced by the amount demonstrated to be reasonable compensation for personal services actually rendered before the change in ownership or control. Sec. 280G(b)(4)(B).  However, petitioner does not contend that this provision applies in the instant case.

entered into after the change in control.  For the reasons outlined below, we agree with respondent.

The phrase "contingent on a change in the ownership or effective control of the corporation" as used in section 280G is not further defined in the statute.  However, the legislative history of that section provides that "a payment is to be treated as contingent on a change of ownership or control * * * if such payment would not in fact have been made to the disqualified individual had no change in ownership or control occurred."  H. Rept. 98-861, at 851 (1984), 1984-3 C.B. (Vol. 2) 1, 105; see also Cline v. Commissioner, 34 F.3d 480, 486 (7th Cir. 1994) (adopting foregoing standard), affg. Balch v. Commissioner, 100 T.C. 331 (1993).  Furthermore, the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 states that "A payment generally is to be treated as one which would not have in fact been made unless it is substantially certain, at the time of the change, that the payment would have been made whether or not the change occurred."  Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 201 (J. Comm. Print 1984).  In this regard, a payment may be treated as contingent on a change in ownership or control even if the employment of the disqualified individual receiving the payment is not voluntarily or

involuntarily terminated.  See H. Rept. 98-861, supra at 851, 1984-3 C.B. (Vol. 2) at 105.

In 1989 the Commissioner issued proposed regulations under section 280G in question and answer (Q&A) format.[30]  See sec. 1.280G-1, Proposed Income Tax Regs., 54 Fed. Reg. 19390 (May 5, 1989) (as corrected by 54 Fed. Reg. 25879 (June 20, 1989) and 54 Fed. Reg. 29061 (July 11, 1989)) (hereinafter, proposed regulations).  Q&A-22 of the proposed regulations defines "contingent on a change in the ownership or effective control" in a manner consistent with the legislative history:

> In general, a payment is treated as "contingent" on a change in ownership or control if the payment would not, in fact, have been made had no change in ownership or control occurred.  A payment generally is to be treated as one which would not, in fact, have been made in the absence of a change in ownership or control unless it is substantially certain, at the time of the change, that the payment would have been made whether or not the change occurred.  * * *

---

[30] The Commissioner issued revised proposed regulations on Feb. 20, 2002, and final regulations under sec. 280G on Aug. 4, 2003.  See sec. 1.280G-1, Proposed Income Tax Regs., 67 Fed. Reg. 7630 (Feb. 20, 2002); sec. 1.280G-1, Income Tax Regs.  These regulations are not applicable here because they apply to payments contingent on a change in ownership or control that occurs on or after Jan. 1, 2004.  See sec. 1.280G-1, Q&A-48, Proposed Income Tax Regs., 67 Fed. Reg. 7656 (Feb. 20, 2002); sec. 1.280G-1, Q&A-48, Income Tax Regs.  Where, as here, the change in ownership or control occurred prior to Jan. 1, 2004, the Commissioner has conceded that taxpayers may rely on the 1989 proposed regulations.  See Preamble to sec. 1.280G-1, Income Tax Regs., 68 Fed. Reg. 45745 (Aug. 4, 2003); see also Preamble to sec. 1.280G-1, Proposed Income Tax Regs., 67 Fed. Reg. 7630 (Feb. 20, 2002).

Sec. 1.280G-1, A-22(a), Proposed Income Tax Regs., 54 Fed. Reg. 19398 (May 5, 1989). The next Q&A clarifies this rule with respect to payments made under agreements entered after a change in control. Q&A-23 of the proposed regulations states:

> Q-23: May a payment be treated as contingent on a change in ownership or control if the payment is made under an agreement entered into after the change?
>
> A-23: (a) No. Payments are not treated as contingent on a change in ownership or control if they are made (or to be made) <u>pursuant to</u> an agreement entered into after the change. For this purpose, an agreement that is executed after a change in ownership or control, <u>pursuant to</u> a legally enforceable agreement that was entered into before the change, will be considered to have been entered into before the change. * * * [Sec. 1.280G-1, Q&A-23, Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5, 1989); emphasis added.]

Both petitioner and respondent have framed the "contingent on control change" issue as turning upon the precise meaning of the phrase "pursuant to" in Q&A-23 of the proposed regulations.[31] While proposed regulations are not competent authority and "carry no more weight than a position advanced on brief by the

---

[31] We note that the revised proposed and final regulations under sec. 280G (see <u>supra</u> note 28), modified Q&A-23 to provide that where a taxpayer gives up rights under an agreement entered into before a change in control as consideration for rights under a new agreement, entered into after a change in control, the payments under the post-change agreement will be considered contingent on a change in control to the extent payments under the post-change agreement have the same value as those due under the pre-change agreement. See sec. 1.280G-1, Q&A-23, Proposed Income Tax Regs., 67 Fed. Reg. 7630 (Feb. 20, 2002); sec. 1.280G-1, Q&A-23, Income Tax Regs.

respondent", <u>F.W. Woolworth Co. v. Commissioner</u>, 54 T.C. 1233, 1265-1266 (1970); see also <u>Houston Oil & Minerals Corp. v. Commissioner</u>, 92 T.C. 1331, 1338 (1989), affd. 922 F.2d 283 (5th Cir. 1991); <u>Driggs v. Commissioner</u>, 87 T.C. 759, 771 n.10 (1986); <u>Miller v. Commissioner</u>, 70 T.C. 448, 460 (1978), respondent has conceded that petitioner may rely on these proposed regulations with respect to a change in ownership or control that occurs prior to January 1, 2004, see Preamble to sec. 1.280G-1, 68 Fed. Reg. 45745 (Aug. 4, 2003); see also Preamble to sec. 1.280G-1, Proposed Income Tax Regs., 67 Fed. Reg. 7630 (Feb. 20, 2002). Even though petitioner is entitled to rely on the version of Q&A-23 contained in the 1989 proposed regulations, that version does not support petitioner's position.

In an effort to bring the payments at issue within the exception in Q&A-23 to treatment as contingent on a change in control, petitioner offers considerable argument in support of the claim that the Retention Payments and disputed 1991 SRP Benefits were made "pursuant to" the 1991 Employment Agreements (as amended in 1992) rather than the 1990 Employment Agreements. This is not the issue, however. No one seriously disputes that the payments in question where made "pursuant to" the 1991 Employment Agreements, as amended in 1992; the dispute concerns whether the 1991 Employment Agreements were executed "pursuant to" the 1990 Employment Agreements. To the extent we can

interpret petitioner as addressing the latter point, petitioner
seems to suggest that a pre-control-change agreement must have
imposed a legal obligation on, or there must have existed at
least an informal pre-control-change understanding requiring, the
parties to enter into the post-control-change agreement under
which the payments are made in order for such payments to be
treated as contingent on a change in control within the meaning
of section 280G.  As petitioner observes on brief:

> In the instant case neither Petitioner nor the
> executives were under any legal obligation to enter
> into the 1991 Employment Agreements or the 1992
> Amendments [citations omitted]; they could have gone in
> separate directions from the legal standpoint. * * *
> Thus, the payments necessarily were made "pursuant to"
> the new [i.e., 1991 and 1992] agreements and were not
> contingent on a change in control of Petitioner.  * * *

> * * * * * * *

> [I]n the instant case there was no formal or informal
> pre-acquisition understanding that the parties would
> enter into the 1991 Employment Agreements or the 1992
> Amendments and that the * * * [retention] payments [and
> 1991 SRP Benefits] would be made under those
> agreements.

Respondent interprets "pursuant to" as used in Q&A-23's
reference to the relationship between pre- and post-control-
change agreements in the sense of the earlier agreement's
functioning as a proximate cause of certain terms of the later
agreement.  Thus, if a legally enforceable pre-control-change
agreement is the proximate cause of provisions in an agreement
entered into after the change in control, the latter agreement is

treated as executed "pursuant to" the former within the meaning of the proposed regulations.  As a consequence, under the proposed regulations, the latter agreement is "considered to have been entered into before the change."  Sec. 1.280G-1, A-23, Proposed Income Tax Regs., supra.  Respondent's argument is that the Retained Executives were able to obtain key terms of the 1991 Employment Agreements--which entitled each to a Retention Payment and a 1991 SRP Benefit calculated to exceed the value of his Termination Award and SRP Cashout--because of the 1990 Employment Agreements which, in the event of a change in control, entitled each Retained Executive to a Termination Award and SRP Cashout at his sole discretion.  The Retained Executives' entitlement to the Termination Awards and SRP Cashouts under the 1990 Employment Agreements thus gave them "a significant degree of leverage in their negotiations with Schneider" over the 1991 Employment Agreements, respondent argues.  In respondent's view, "the 1991 Employment Agreements were executed pursuant to the 1990 Employment Agreements, within the meaning of Prop. Treas. Reg. § 1.280G-1, Q&A-23, because the terms of the post-acquisition agreements were dictated by the parachute provisions of the pre-acquisition agreements."

We conclude that respondent's construction of "pursuant to" is consistent with the meaning of "contingent on a change in the ownership or effective control of the corporation" used in

section 280G(b)(2)(A)(i), as that meaning has been clarified in the legislative history of the statute.  Petitioner's construction, by contrast, would contravene the meaning intended by Congress.  As noted, the legislative history provides that a payment is to be deemed contingent on a change in control if the payment "would not in fact have been made to the disqualified individual had no change in ownership or control occurred", H. Rept. 98-861, supra at 851, 1984-3 C.B. (Vol. 2) at 105; in sum, Congress intended a factual "but for" test.  Respondent's construction of "pursuant to", which interprets it as conveying a factual, causal nexus rather than legal or contractual necessity, accords with the legislative history.  Petitioner's construction, which would find the "pursuant to" relationship to exist between pre- and post-control-change agreements only where the former legally required the latter, produces a far narrower construction of "contingent on a change in * * * control" than Congress intended.  We therefore reject it.  Thus, section 1.280G-1, A-23, Proposed Income Tax Regs., supra, is no help to petitioner.

Absent section 1.280G-1, Q&A-23, Proposed Income Tax Regs., supra, we think respondent easily prevails in his claim that the Retention Payments and the disputed 1991 SRP Benefits were contingent on a change in control within the meaning of section 280G.  Both this Court and the Court of Appeals for the Seventh Circuit, to which appeal of this case would ordinarily lie, have

endorsed the previously quoted legislative history's gloss on the meaning of "contingent on a change in * * * control" as used in the statute. See Cline v. Commissioner, 34 F.3d 480 (7th Cir. 1994). In Cline, the taxpayer entered into a severance agreement that would have subjected the taxpayer to an excise tax for parachute payments under section 4999 and his employer to a deduction disallowance under section 280G. To avoid this result, the taxpayer and his employer renegotiated the agreement to reduce the severance payment below the threshold level. The employer then agreed to use its best efforts to employ the taxpayer so as to make up the amount subtracted from the original agreement. In the end, the taxpayer received a bonus almost equivalent to the reduction in the parachute payment. The Seventh Circuit affirmed this Court, which found that the later payment, negotiated after the change in control, was properly considered as contingent on a change of control. Cline v. Commissioner, supra at 485.

On this record, we have no difficulty concluding that the Retention Payments and the disputed 1991 SRP Benefits "would not in fact have been made * * * had no change in ownership or control occurred." H. Rept. 98-861, supra at 851, 1984-3 C.B. (Vol. 2) at 105. The facts in this case are that Schneider had no feasible alternative to retaining the Retained Executives in order to protect its $2.25 billion investment in petitioner, that

the Retained Executives were aware of Schneider's plight, and that the Retained Executives used their entitlement to the Termination Awards and SRP Cashouts as a sword in their negotiations with Schneider concerning the terms of their compensation for continued employment. As one Retained Executive expressed it in a letter to a negotiator for Schneider, "One way or the other, * * * [the] parachute payments will be paid", and "Not one officer is willing to give up what they are entitled to under their [1990 employment] contract".

Schneider ultimately agreed to Retention Payments and 1991 SRP Benefits that exceeded the Termination Awards and SRP Cashouts payable under the 1990 Employment Agreements if the Retained Executives had elected to terminate their employment during the June 1992 Window. Indeed, as reflected in our findings of fact, the Retention Payment payable to each Retained Executive if his employment terminated (other than for cause) on the first day the 1991 Employment Agreements became effective-- that is, without his providing any services--exceeded the Termination Award to which the executive was entitled if he unilaterally terminated his employment during the June 1992 Window under the 1990 Employment Agreements. The role of the 1991 SRP Benefit in replacing the SRP Cashout provided in the 1990 Employment Agreements is similarly transparent. The 1991 SRP Benefit was in general computed as an amount equal to the SRP

Cashout under the 1990 Employment Agreements for a termination as of December 31, 1991, plus interest to the date paid.

In sum, the circumstances surrounding the negotiations that secured the Retained Executives' rights to the Retention Payments and 1991 SRP Benefits under the 1991 Employment Agreements, and the relationship between these payments and the Termination Awards and SRP Cashouts under the 1990 Employment Agreements, convince us, and we so find, that the Retention Payments and 1991 SRP Benefits were obtained by the Retained Executives as consideration in exchange for relinquishing their rights to the Termination Awards and SRP Cashouts.[32]  Since the latter payments were indisputably contingent on a change in control, and they were relinquished in exchange for the Retention Payments and 1991 SRP Benefits, we are persuaded that the Retention Payments and the disputed 1991 SRP Benefits would not in fact have been made absent the change in ownership.  Accordingly, we hold that the

---

[32] Although it is true that a Retained Executive's right to receive a Termination Award was essentially unconditional (during the June 1992 Window), while his right to a Retention Payment was conditioned upon either (i) involuntary termination without cause, (ii) voluntary termination for "good reason", or (iii) completion of an approximately 3-year employment period, we believe that a Retained Executive was compensated for the assumption of these new restrictions by the amount by which the Retention Payment exceeded the Termination Award.  Specifically, the Retention Payment payable to each Retained Executive on the first day the 1991 Employment Agreement was effective exceeded his Termination Award, and the Retention Payment increased pro rata for each week of employment after the effective date of the 1991 Employment Agreement.

Retention Payments and the disputed 1991 SRP Benefits were contingent on a change in ownership or effective control within the meaning of section 280G(b)(2)(A).

Concededly, the Retention Payments and disputed 1991 SRP Benefits also served in part as consideration for future services, as the Retained Executives were generally required to serve out a 3-year (later amended to 4-year) term of employment to receive them (unless terminated for cause or "good reason"). However, the statute contemplates situations where such contingent payments that fall within the definition of "parachute payment" may also serve as consideration for future services, and provides a mechanism for exempting amounts from parachute payment treatment that the taxpayer can show are serving the latter function; namely, by proving that they are reasonable compensation for services rendered or to be rendered. See sec. 280G(b)(4). The parties dispute whether the amounts determined by respondent to be contingent on a change in control constitute reasonable compensation within the meaning of section 280(G)(b)(4), and it is to that dispute that we now turn.

C. <u>Reasonable Compensation--Applicable Test</u>

Since the Retention Payments and the disputed 1991 SRP Benefits were contingent on a change in control, they are parachute payments for purposes of section 280G except to the extent that petitioner can establish by clear and convincing

evidence that any portion of those payments constituted reasonable compensation for services to be rendered on or after the change in ownership or control.[33]  Respondent does not contest the deductibility as reasonable compensation of any other payments received by the Retained Executives in 1992.

In deciding whether petitioner has shown that any portion of the payments at issue constituted reasonable compensation for purposes of section 280G(b)(4), we are faced with the threshold question of the appropriate test or standard to use for assessing the reasonableness of compensation.  In Cline v. Commissioner, 34 F.3d 480 (7th Cir. 1994), the Court of Appeals for the Seventh Circuit, to which an appeal in this case would ordinarily lie, approved our use of a multifactor test as a means of determining whether compensation is reasonable for purposes of section 280G. More recently, however, the Court of Appeals rejected the use of a multifactor test to determine reasonable compensation for purposes of section 162(a)(1), holding that an "independent

---

[33] Sec. 280G(b)(4) provides in part:

(4) Treatment of amounts which taxpayer establishes as reasonable compensation.--In the case of any payment described in paragraph (2)(A)--
(A) the amount treated as a parachute payment shall not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is reasonable compensation for personal services to be rendered on or after the date of the change described in paragraph (2)(A)(i) * * *

investor" test must instead be used.[34]  Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220.  As Exacto Spring Corp. concerned reasonable compensation for purposes of section 162(a), it is distinguishable from the instant case, and therefore we are not bound by Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to follow it here.

Nonetheless, the disfavor with which the Court of Appeals views the traditional multifactor test for reasonable compensation prompts us to consider carefully whether it is appropriate to extend the independent investor test of Exacto

---

[34] In Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, the Court of Appeals for the Seventh Circuit rejected a multifactor test for reasonable compensation in a sec. 162(a)(1) context (which examined such factors as the employee's skills and duties, prior earning capacity, the prevailing compensation paid to employees with comparable jobs, etc.) because, inter alia, the factors conventionally used in a multifactor test "do not bear a clear relation * * * to the primary purpose of section 162(a)(1), which is to prevent dividends (or in some cases gifts), which are not deductible from corporate income, from being disguised as salary, which is."  Id. at 835.  The Court of Appeals held instead that the independent investor test, which "dissolves the old [multifactor test] and returns the inquiry to basics", id. at 838, must be used.  The independent investor test as fashioned by the Court of Appeals for the Seventh Circuit looks solely at the rate of return that has been generated for the corporation's owners by its "managers" (i.e., its high-level employees whose compensation is at issue).  If the rate of return (after compensating the managers) is one that would, according to expert opinion, be acceptable to an independent investor, considering the risks of the investment, then the managers' compensation is presumptively reasonable.  Id. at 838-839.

Spring Corp. to circumstances where reasonable compensation must be measured for purposes of section 280G.  We do not do so, because we conclude that use of the independent investor test to determine reasonable compensation for purposes of section 280G would contravene congressional intent.

"Reasonable compensation" as that term is used in section 280G(b)(4) is not further defined in the statute.  Neither the committee nor conference reports accompanying the enactment of original section 280G in the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, provide any guidance regarding how "reasonable compensation" as employed in section 280G(b)(4) is to be determined.  However, the Joint Committee on Taxation's General Explanation covering the legislation states:

> In the case of an employment contract, whether payments under it would be deemed reasonable would depend on all the facts and circumstances, including the individual's historic compensation, the duties to be performed under the contract, and the compensation of individuals of comparable skills outside of an acquisition context. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 204 (J. Comm. Print 1984).]

An amendment to the statute 2 years after section 280G was enacted contains direct legislative history concerning the intent underlying "reasonable compensation".  In 1986, Congress amended section 280G(b)(4) to provide, in cases where the taxpayer establishes that a parachute payment constitutes reasonable compensation, for different treatment where the reasonable

compensation is for services provided before, or after, the date of the change in ownership or control.  See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1804(j)(2), 100 Stat. 2808.  In connection with this amendment of the reasonable compensation provisions of section 280G, the Finance Committee report states:

> The committee intends that evidence that amounts paid to a disqualified individual for services to be rendered that are not significantly greater than amounts of compensation (other than compensation contingent on a change in ownership or control or termination of employment) paid to the disqualified individual in prior years or customarily paid to similarly situated employees by the employer or by comparable employers will normally serve as clear and convincing evidence of reasonable compensation for such services.  [S. Rept. 99-313, at 919-920 (1986), 1986-3 C.B. (Vol. 3) 1, 919-920; see also H. Rept. 99-426, at 902 (1985), 1986-3 C.B. (Vol. 2) 1, 902 (containing substantially identical language).]

The foregoing legislative history convinces us that Congress intended that reasonable compensation for purposes of section 280G(b)(4) was generally to be determined under the conventional multifactor test.  The factors enumerated in the Finance Committee report--that is, the employee's compensation in prior years and the compensation paid to similarly situated employees of the taxpayer or of comparable employers--are archetypal factors of the conventional multifactor test.[35]  We accordingly

---

[35] Similar factors are also included in Q&A-40 of the proposed, revised proposed, and final regulations.  Sec. 1.280G-1, Proposed Income Tax Regs., 54 Fed. Reg. 19406 (May 5, 1989), as corrected by 54 Fed. Reg. 25879 (June 20, 1989) and further
(continued...)

conclude that extension of the Court of Appeals for the Seventh Circuit's independent investor test for determining reasonable compensation under section 162(a) to the golden parachute context would be contrary to congressional intent.

Our conclusion is buttressed by consideration of the differing purposes served by sections 162(a)(1) and 280G(b)(4). As pointed out by the Court of Appeals in Exacto Spring Corp., section 162(a)(1) is designed to address the problem created by a closely held corporation's controlling shareholder-employee's incentive to mischaracterize a nondeductible dividend as deductible compensation for services. The independent investor test addresses this abuse by testing the claimed compensation against the result that market forces would produce: That is, the compensation that an independent investor, not affected by the tax incentives operating on an investor-employee, would be willing to pay a corporate manager producing a given rate of return.

In enacting section 280G, Congress set out to address a different problem: The deleterious effect, in Congress's view, of golden parachute contracts on the acquisition process for publicly traded corporations, because such arrangements

---

[35](...continued)
corrected by 54 Fed. Reg. 29061 (July 11, 1989); sec. 1.280G-1, Proposed Income Tax Regs., 67 Fed. Reg. 7654 (Feb. 20, 2002); sec. 1.280G-1, Income Tax Regs.

discouraged would-be acquirers, created conflicts of interest between the managers and shareholders of such corporations, and tended to reduce the share of the acquisition proceeds that should go to the seller's shareholders. Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 199-200 (J. Comm. Print 1984). In this context, Congress concluded that golden parachutes should be strongly discouraged by exacting a "tax penalty" if they are paid. S. Prt. 98-169 (Vol. 1), at 195 (1984).

The purpose of section 280G, then, is to impose a tax penalty on a corporation that pays golden parachutes, defined generally as payments that are extraordinarily large in relation to the recipient's historical compensation and are contingent on a change in control of the corporate payor. Moreover, the statute provides that such payments are presumptively unreasonable compensation. We do not believe that an independent investor test for reasonable compensation is well designed to accomplish Congress's goal, since it asks only whether an independent investor would have been satisfied with his return after payment of the parachute payments (plus any other compensation) to management. Presumably, when golden parachutes are present, an acquisition goes forward because the acquirer-- who is an actual, not merely hypothetical, independent investor-- believes that his rate of return after paying the golden

parachutes will be satisfactory.  Otherwise, the acquirer would not proceed with the transaction.[36]  Thus it would appear that in any case where an acquisition of a publicly traded corporation has been consummated, triggering the payment of golden parachutes contingent thereon, the amounts so paid (at least where connected to services) would tend to be found reasonable compensation under an independent investor test.  Accordingly, applying the independent investor test to segregate reasonable from unreasonable compensation in the acquisition context may not produce results that are meaningful in light of the intent of section 280G.[37]

Instead, we believe the touchstone of reasonable compensation that Congress intended for section 280G(b)(4) is, as phrased in the legislative history, the amount that would be paid "outside of an acquisition context."  Staff of Joint Comm. on

---

[36] A would-be acquirer will typically have knowledge of the existence of golden parachute contracts, as did Schneider in this case, because such compensation arrangements are generally required to be disclosed in a publicly traded corporation's proxy statements filed with the Securities and Exchange Commission. See 17 C.F.R. sec. 229.402(b)(2)(v)(A)(2) (2000).

[37] One can imagine other situations where reasonable compensation must be determined, yet an independent investor test may not be readily applied.  For example, the payment of unreasonable compensation to an employee of a sec. 501(c)(3) organization may constitute private inurement in violation of that section.  See, e.g., B.H.W. Anesthesia Found., Inc. v. Commissioner, 72 T.C. 681 (1979).  However, the concept of an appropriate return on investment would appear inapposite in the case of a nonprofit enterprise.

Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 204 (J. Comm. Print 1984). The independent investor test takes no account of the existence or absence of an acquisition context. The conventional multifactor test, which considers, inter alia, historical (preacquisition) compensation as well as compensation paid by comparable companies that have not been recently acquired, is better designed to identify the amount of compensation that would have been paid outside an acquisition context, and it is this amount that we conclude Congress intended to treat as reasonable compensation for purposes of section 280G(b)(4).[38]

---

[38] Even if the independent investor test were applied in this case, petitioner has failed to demonstrate by clear and convincing evidence that its after-tax return on equity in 1992 would have been satisfactory to a hypothetical independent investor.

Based on its audited financial statements, petitioner's after-tax return on equity for 1992 was negative. After making a series of adjustments that purportedly eliminate the effects of its acquisition and associated indebtedness, petitioner contends that its return on equity was more than 20 percent in 1992. We need not decide whether petitioner has demonstrated clearly and convincingly that these adjustments are appropriate because, in any event, petitioner has failed to demonstrate what the rates of return for comparable companies would be if similar adjustments were made to their earnings and stockholders' equity. Accordingly, even if an independent investor test were applicable, petitioner has not shown that the compensation paid to the Retained Executives was reasonable thereunder.

D.  Determination of Reasonable Compensation

1.  Overview of Expert Testimony

Having decided to apply a multifactor test, we turn to a consideration of whether petitioner has met its burden of showing by clear and convincing evidence that the Retention Payments and disputed 1991 SRP Benefits constitute reasonable compensation. Both parties presented expert testimony on the reasonableness of the Retained Executives' compensation under the 1991 Employment Agreements, as amended in 1992.[39]  Petitioner's expert, Pearl Meyer, is an executive compensation consultant with more than 40 years' experience.  Respondent's expert, Arthur Rosenbloom, is a financial consultant and investment banker specializing in securities valuation and mergers and acquisitions with more than 30 years' experience.  Both Ms. Meyer and Mr. Rosenbloom authored opening and rebuttal expert reports and testified at trial.

---

[39] Petitioner also argues that the compensation of the Retained Executives under the 1991 Employment Agreements was reasonable because it was the product of arm's-length bargaining. The short answer to petitioner's argument is that, while the negotiations may have been at arm's length, they were indisputably skewed by the Retained Executives' right to collect their substantial Termination Awards and SRP Cashouts in June 1992, without providing any future services.  Thus, as reflected in our findings, a significant portion of the Retention Payments and 1991 SRP Benefits served to compensate the Retained Executives for the relinquishment of their rights to the Termination Awards and SRP Cashouts, not for their future services.  Consequently, the arm's-length nature of the bargaining provides no assurance that the amounts paid were arm's-length consideration for the services to be rendered.

We evaluate the opinions of experts in light of the qualifications of each expert and all other evidence in the record.  Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part revg. and remanding in part T.C. Memo. 1983-200), affg. in part, revg. in part T.C. Memo. 1986-318.  We are not bound by the opinion of an expert when that opinion is contrary to our judgment.  Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139.  While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion, Parker v. Commissioner, supra at 562.

Both experts considered numerous factors, including the skills and responsibilities of each Retained Executive before and after the merger and the compensation of purportedly comparable executives of other companies.  Mr. Rosenbloom conducted an analysis of compensation paid by petitioner to the Retained

Executives before and after the acquisition by Schneider, as well as a comparison of the Retained Executives' compensation paid in 1992 with compensation paid in 1992 to executives of other companies. Ms. Meyer conducted what she termed an internal analysis, focusing on aspects of petitioner's financial condition and need for skilled executives, and three external analyses, which measured the Retained Executives' compensation packages against those of executives working at other companies.

We conclude that two of Ms. Meyer's external analyses fall considerably short of providing clear and convincing evidence of the reasonableness of the compensation of the Retained Executives in 1992. One such analysis employs data from "executive compensation surveys" prepared by Towers Perrin, Watson Wyatt Data Services, and William M. Mercer, Inc. As described in Ms. Meyer's opening report, these surveys include compensation data from anywhere from 250 to 1,000 organizations, many of which are conceded to be outside the electrical equipment industry. We reject this analysis because it employs data from companies that have not been shown to be comparable to petitioner. Although section 280G itself does not address the use of comparable companies and their executives as a basis for determining reasonable compensation, the legislative history of the 1986 amendment of section 280G(b)(4) specifically endorses the use of "similarly situated employees" working for "comparable employers"

as a means of determining reasonable compensation.  S. Rept. 99-313, supra at 919-920, 1986-3 C.B. (Vol. 3) at 919-920; H. Rept. 99-426, supra at 902, 1986-3 C.B. (Vol. 2) at 902.  In our view, if the designation of "comparable employers" is to have meaningful content, it must be more restrictive than data sources for these surveys, which include an many as 1,000 organizations.

In a second external analysis, Ms. Meyer examined compensation arrangements between (i) companies engaged in the electrical equipment or substantially similar industries, and (ii) executives of those companies, focusing on compensation paid to executives for purposes of recruitment, promotion, or retention.  However, of the 22 arrangements examined by Ms. Meyer, only one involved calendar year 1992.  Consequently, the relevance of Ms. Meyer's findings under this approach to the ascertainment of reasonable compensation in 1992 has not been clearly established, and we reject them.

A third external analysis performed by Ms. Meyer is more promising.  In it, she utilized publicly available disclosures of executive compensation contained in proxy statements filed by publicly traded companies with the Securities and Exchange Commission (SEC) to compare the compensation of purportedly comparable executives to the compensation of the Retained Executives.  Mr. Rosenbloom used a similar approach based on SEC proxy materials.  These comparisons based on SEC proxy materials

constitute a principal basis for each expert's opinion regarding the reasonableness of the Retained Executives' compensation.  We shall consider the experts' differences in more detail hereinafter.

### 2. Historical Compensation

As noted, Mr. Rosenbloom also performed an analysis of the Retained Executives' compensation before and after the acquisition by Schneider.  Notably absent from Ms. Meyer's opening report is any serious consideration of the Retained Executives' historical compensation.[40]  The legislative history of section 280G makes clear that one factor to be considered in determining reasonable compensation for purposes of section 280G(b)(4) is "compensation * * * paid to the disqualified

---

[40] Ms. Meyer addressed historical compensation only in her rebuttal report, by way of criticizing Mr. Rosenbloom's analysis. In connection therewith, Ms. Meyer reached the conclusion that the appropriate historical comparison should be between the compensation paid to all of petitioner's senior executives prior to the acquisition and the compensation paid to all such executives after the acquisition.  In Ms. Meyer's computations, the increase in these two figures was only 48 percent between 1988 and 1992, which she found unremarkable.  In reaching this figure, however, Ms. Meyer omitted entirely the Retention Payments and 1991 SRP Benefits paid to the Retained Executives in 1992, notwithstanding the fact that petitioner has stipulated that a substantial portion of the former and all of the latter were earned by the Retained Executives in that year.  Moreover, as discussed more fully hereinafter, we reject the notion that compensation payments of this magnitude can be ignored in measuring the reasonableness of the Retained Executives' compensation in 1992.  Accordingly, we accord no weight to Ms. Meyer's attempt at an historical analysis of the Retained Executives' compensation.

individual in prior [i.e., to the change in control] years". S. Rept. 99-313, supra at 919-920, 1986-3 C.B. (Vol. 3) at 919-920; H. Rept. 99-426, supra at 920, 1986-3 C.B. (Vol. 2) at 902.

Mr. Rosenbloom analyzed the increases in the Retained Executives' compensation from 1990 to 1992 and concluded that the increases ranged from 159 to 537 percent. Ms. Meyer faulted several aspects of Mr. Rosenbloom's methodology, including his treatment of stock options, restricted stock, perquisites, and LTIP payouts. Aside from the LTIP payouts, the parties entered stipulations, apparently subsequent to the drafting of the expert reports, that establish the amounts of the foregoing compensatory payments that were earned in 1990 and 1992. On the basis of the compensation which it has been stipulated the Retained Executives earned, a comparison of 1990 and 1992 compensation is possible, and the results are comparable to Mr. Rosenbloom's.[41] Without treating any portion of the LTIP payout as earned in 1992 (notwithstanding that the payout was determined with respect to services in 1992, 1993, and 1994), the Retained Executives' 1990

---

[41] Mr. Rosenbloom's computation of the increase from 1990 to 1992 is conservative in one important respect, because he includes in 1992 compensation only 25 percent of the Retention Payments and 1991 SRP Benefits paid to the Retained Executives in that year. The parties have stipulated that a substantially larger portion of the Retention Payments, and all of the 1991 SRP Benefits, were earned by the Retained Executives in 1992. When the stipulated amounts are added to 1992 compensation, the increase over 1990 is augmented to that extent.

and 1992 compensation, and the percentage increase therein, is as follows:

| Retained Executive | 1990 Compensation | 1992 Compensation | Percentage Increase |
|---|---|---|---|
| Brink | $324,100 | $896,213 | 177 |
| Denny | 697,380 | 2,390,159 | 243 |
| Francis | 401,174 | 1,001,502 | 150 |
| Free | 399,759 | 1,631,890 | 308 |
| Garrett | 456,100 | 2,172,240 | 376 |
| Hite | 505,378 | 1,524,496 | 202 |
| Kurczewski | 463,038 | 1,208,543 | 161 |
| Pugh | 205,031 | 897,250 | 338 |
| Richardson | 218,492 | 1,071,015 | 390 |
| Thompson | 498,474 | 940,621 | 89 |
| Williams | 182,320 | 931,627 | 411 |

If the Retained Executives are treated as having earned one-third of their LTIP payout in 1992 (which we elsewhere conclude is appropriate when measuring reasonable compensation for purposes of section 280G), the percentage increase in their compensation from 1990 to 1992 is as follows:

| Retained Executive | 1990 Compensation | 1992 Compensation[1] | Percentage Increase |
|---|---|---|---|
| Brink | $324,100 | $1,093,613 | 237 |
| Denny | 697,380 | 2,831,254 | 306 |
| Francis | 401,174 | 1,117,239 | 178 |
| Free | 399,759 | 1,865,816 | 367 |
| Garrett | 456,100 | [2]2,172,240 | 376 |
| Hite | 505,378 | 1,744,526 | 245 |
| Kurczewski | 463,038 | 1,396,821 | 202 |
| Pugh | 205,031 | [3]992,638 | 384 |
| Richardson | 218,492 | 1,191,644 | 445 |
| Thompson | 498,474 | 1,145,748 | 130 |
| Williams | 182,320 | 1,080,292 | 493 |

[1] Includes 1/3 of LTIP payout.
[2] Mr. Garrett did not receive an LTIP payout.
[3] Includes 1/2 of LTIP payout.

In developing a comparison of pre- and postacquisition compensation, we believe that 1990 is the most appropriate measure of preacquisition compensation because in 1991 the Retained Executives received $10,896,942 in compensation that was triggered by the acquisition.[42] Thus, 1991 compensation does not reflect preacquisition levels of compensation. The dramatic increase between the 1990 (preacquisition) compensation and 1992 (postacquisition) compensation of the Retained Executives provides support for the conclusion that the Retention Payments and 1991 SRP Benefits earned in 1992 were not reasonable compensation for purposes of section 280G(b)(4). Petitioner has

_____

[42] This figure consists of $8,752,996 in stock-related payments under the 1990 Employment Agreements, plus $2,143,946 in "gross up" payments to compensate the Retained Executives for nondeductible excise taxes they incurred as a result of their receipt of the stock-related payments.

not shown that any comparable executives, outside an acquisition context, received similar increases in their compensation over this period.

### 3. Analysis of Comparables

As noted previously, the two experts' use of compensation of purportedly comparable executives disclosed in SEC proxy filings to test the reasonableness of the Retained Executives' compensation was a principal basis for their conclusions and, of Ms. Meyer's various "external" analyses, the only one we have not rejected. However, the approach used by Ms. Meyer raises two threshold methodological issues that must be resolved.

### a. Relevant Period for Reasonable Compensation Comparison

In developing her comparables analysis, Ms. Meyer generally considered compensation data for the aggregate period of 1992 through 1995 in her opening report; in her rebuttal report she considered data for 1992 only. Mr. Rosenbloom generally considered such data for 1992 only. Ms. Meyer's use of 4-year aggregate figures in her analysis presents a threshold methodological issue. Ms. Meyer and petitioner, on brief, take the position that the reasonableness of the Retained Executives' compensation under the 1991 Employment Agreements (as amended) should be assessed on the basis of the total compensation paid to the Retained Executives over the approximately 4-year period

covered by the Agreements (i.e., late 1991 through 1995), as compared to the total compensation paid to comparable executives over a similar period. In the view of petitioner and Ms. Meyer, this aggregate approach is appropriate because the Retention Payments covered approximately 4 years of services;[43] thus, the Retention Payments should be combined with the other compensation earned by the Retained Executives for these 4 years of services (e.g., salary, STIP, LTIP) and the resulting 4-year total compared to the 4-year total compensation earned by comparable executives to determine reasonableness.

We disagree. Section 280G(b)(4) provides that a parachute payment "shall not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is reasonable compensation for personal services to be rendered on or after the date of the change" in control. Sec. 280G(b)(4)(A). While the statute is broad enough to encompass a contingent-on-control-change payment made for services spanning more than one taxable year, we believe that proof by clear and convincing evidence requires a taxpayer to demonstrate the reasonableness of

---

[43] We note that the Retention Payments paid in December 1992 were subject to a "clawback" provision if a Retained Executive failed to serve out the 4-year term of his 1991 Employment Agreement (as amended). However, the 1991 SRP Benefits paid in December 1992 were not subject to any similar forfeiture.

the compensation paid with respect to the services rendered in a given taxable year.

In December 1992, petitioner paid Retention Payments and 1991 SRP Benefits to the Retained Executives totaling $15,867,291.  Of this amount, petitioner deducted $10,384,490-- consisting of the total[44] of the 1991 SRP Benefits payments and related interest paid to the Retained Executives in 1992 ($4,191,053), plus that portion of the aggregate Retention Payments paid in 1992 with respect to which petitioner took the position that "economic performance" (within the meaning of section 461(h)) had occurred in 1992 ($6,193,437).[45]  The remaining $5,482,801 in Retention Payments paid in 1992 was deferred, according to petitioner, pursuant to section 461(h) and deducted ratably in petitioner's 1993, 1994, and 1995 taxable years.

Having thus taken the position that $10,384,490 in Retention Payments and 1991 SRP Benefits was earned by the Retained Executives in 1992, it is incumbent upon petitioner in our view to demonstrate clearly and convincingly that these amounts, when

---

[44] Petitioner contends that the entire 1991 SRP Benefits payment (plus interest) was deductible when paid in 1992 because, unlike the Retention Payments, such amount was not subject to clawback.

[45] Petitioner has also stipulated that the amount of the Retention Payments and 1991 SRP Benefits that was earned by the Retained Executives in 1992 was $10,384,490.

added to the other compensation earned by the Retained Executives in that year, constituted reasonable compensation for the services rendered in 1992.[46] Ms. Meyer's opening report, which compares the Retained Executives' total compensation[47] (including Retention Payments) over the period 1992-95 with the total compensation over the same period earned by comparable executives, fails to demonstrate what amount of compensation was reasonable for the services rendered in 1992. Ms. Meyer's 4-year aggregate approach effectively treats the Retention Payments and 1991 SRP Benefits as having been earned ratably over 4 years,[48] when in fact they were lump-sum payments totaling $15,867,291 made in 1992, more than 65 percent of which petitioner treated in its return as earned by the Retained Executives in 1992. Nothing

---

[46] The parties generally disregard the fact that some portion of the Retention Payments is theoretically allocable to the 46 days in 1991 covered by the 1991 Employment Agreements. As we do not consider this allocation material, we shall likewise disregard it.

[47] Ms. Meyer excludes from the Retained Executives' compensation any portion of the 1991 SRP Benefits that was paid to them in December 1992. As more fully discussed infra, we do not agree that such amounts are appropriately excluded from 1992 compensation. Moreover, we believe Ms. Meyer's treatment of the 1991 SRP Benefits conflicts with petitioner's stipulation that they were earned in 1992.

[48] More precisely, Ms. Meyer did not treat the 1991 SRP Benefits as having been earned ratably over the period. Instead, she took the position that the payment of the 1991 SRP Benefits in 1992 should be disregarded in determining whether the challenged payments to the Retained Executives constituted reasonable compensation. See supra note 47.

in Ms. Meyer's opening report suggests how much compensation, of the total amount calculated as reasonable for the 1992-94 period, was reasonable for the services rendered in 1992. Accordingly, the 4-year aggregate approach utilized by Ms. Meyer and urged by petitioner is not persuasive in showing that the Retention Payments and disputed 1991 SRP Benefits that petitioner treated as earned in 1992 constituted reasonable compensation for services rendered in that year--certainly not where petitioner has the burden of demonstrating the foregoing by clear and convincing evidence.

Perhaps sensing the flaw in her 4-year aggregate approach, Ms. Meyer in her rebuttal report confined her analysis to 1992 alone. Because we reject the 4-year aggregate approach, we draw heavily on Ms. Meyer's rebuttal report in evaluating her opinions in this case.

### b. Aggregate Versus Individual Compensation

A second threshold methodological dispute concerns whether the reasonableness of compensation for purposes of section 280G(b)(4) may be assessed on the basis of the Retained Executives as a group or individually. Ms. Meyer and petitioner take the position that the reasonableness of the Retained Executives' compensation need only be demonstrated in the aggregate. That is, so long as the total aggregate compensation of the 11 Retained Executives is reasonable in comparison to the

total compensation of a comparable <u>group</u> of executives, it should be treated as reasonable for purposes of section 280G(b)(4) even though the individual compensation of certain Retained Executives was unreasonable.[49]

We conclude that petitioner's and Ms. Meyer's position is unsupportable as a matter of law.  First, the legislative history of section 280G indicates that Congress contemplated that the test for reasonableness of compensation would be applied on an individual basis.

> The committee intends that evidence that amounts paid to a disqualified <u>individual</u> for services to be rendered that are not significantly greater than amounts of compensation * * * paid to the disqualified <u>individual</u> in prior years * * * will normally serve as clear and convincing evidence of reasonable compensation for such services.  [S. Rept. 99-313, <u>supra</u> at 919-920, 1986-3 C.B. (Vol. 3) at 919-920; see also H. Rept. 99-426, <u>supra</u> at 902, 1986-3 C.B. (Vol. 2) at 902 (containing substantially identical language); emphasis added.]

Moreover, the Finance Committee's description of the test comports with longstanding caselaw requiring the determination of reasonable compensation for purposes of section 162(a)(1) on an individual rather than group basis.  See, e.g., <u>Hendricks Furniture, Inc. v. Commissioner</u>, T.C. Memo. 1988-133; <u>RTS Inv.</u>

---

[49] In her opening report, Ms. Meyer's comparisons demonstrated that, on an individual basis, four of the Retained Executives received unreasonable compensation, but she disregarded this result in light of her view that the aggregate compensation of the Retained Executives as a group was demonstrated as reasonable.

Corp. v. Commissioner, T.C. Memo. 1987-98, affd. 877 F.2d 647 (8th Cir. 1989), affd. without published opinion sub nom. Hilt v. Commissioner, 899 F.2d 1225 (9th Cir. 1990); Schanchrist Foods, Inc. v. Commissioner, T.C. Memo. 1977-129; William E. Davis & Sons, Inc. v. Commissioner, T.C. Memo. 1975-229; Natl. Underwriters, Inc. v. Commissioner, T.C. Memo. 1974-14. The legislative history and the authorities under section 162(a)(1) persuade us that reasonable compensation for purposes of section 280G(b)(4) should be determined on an individual basis. The analyses provided by Ms. Meyer as well as Mr. Rosenbloom facilitate such an approach, which we take hereinafter.

c.    Retained Executives' 1992 Compensation

Under a comparables approach, the initial step in assessing whether the Retention Payments and disputed 1991 SRP Benefits deducted by petitioner in 1992 constitute reasonable compensation involves a determination of the compensation earned by the Retained Executives for 1992 other than the challenged payments. The amounts received by the Retained Executives as base salary and STIP for 1992 are undisputed herein. However, the parties and their experts disagree on how to account for certain other compensatory payments related to 1992, including perquisites, LTIP compensation, and the 1991 SRP Benefits payments.

As noted, both experts obtained compensation information for comparable executives from SEC proxy filings. Their

disagreements concerning the 1992 compensation of the Retained

Executives in the main concern the appropriate adjustments to be

made to the Retained Executives' 1992 compensation to make it

conform to the reporting conventions used in such SEC filings.

(i)  Perquisites

Because the SEC proxy filings utilized by the experts

generally did not disclose perquisites paid to a reporting

company's executives unless the perquisites' value exceeded in

the aggregate the lesser of either $50,000 or 10 percent of

salary and bonus,[50] Ms. Meyer took the position that perquisites

of the Retained Executives should be excluded from their 1992

compensation when comparing it to the compensation of executives

as reported in proxy filings.  Mr. Rosenbloom, by contrast,

included all perquisites in the Retained Executives' 1992

compensation, regardless of amounts.  We agree with Ms. Meyer

that the perquisites of the Retained Executives for 1992 should

be disregarded insofar as they fall below SEC reporting

thresholds, to conform with the conventions underlying the

disclosed compensation of executives to which they are being

compared.[51]  However, we find that Ms. Meyer erred in

---

[50] See 17 C.F.R. sec. 229.402(b)(2)(iii)(C)(1) (1993).

[51] We also agree with Ms. Meyer's position that
reimbursements for moving expenses should be excluded from
perquisites for purposes of comparisons to compensation reported
in proxy filings.  We therefore disregard $77,371 in moving
(continued...)

disregarding all perquisites for all Retained Executives.  Two of the Retained Executives--Mr. Brink and Mr. Francis--received perquisites in 1992 that, according to petitioner's own calculations, exceeded the SEC reporting thresholds.  The 1992 perquisites of Mr. Brink ($89,129) and of Mr. Francis ($33,738) exceeded 10 percent of their respective salary and bonus for that year.  Accordingly, we conclude that the perquisites of these two Retained Executives should be included in their 1992 compensation for purposes of comparing it to the compensation of other executives.

### (ii)  LTIP Compensation

Petitioner made payments totaling $5,803,439 to the Retained Executives in July 1995, pursuant to the LTIP arrangements, with respect to petitioner's financial performance for the years 1992, 1993, and 1994.[52]  In her opening report, Ms. Meyer included the LTIP payouts in the Retained Executives' compensation for the 4-year period 1992-95.  However, in measuring the Retained Executives' 1992 compensation in her rebuttal report, Ms. Meyer took the position that no portion of the LTIP payouts should be included in 1992 compensation because such amounts were not

[51](...continued)
expenses paid to Mr. Pugh in 1992.  Mr. Pugh's remaining 1992 perquisites fall below SEC reporting thresholds.

[52] Mr. Garrett did not receive an LTIP award, and Mr. Pugh's award covered only 1992 and 1993.  See supra note 18.

vested until the end of 1994 and not paid until 1995. Further, Ms. Meyer contended, such long-term incentive compensation awards are not reported in SEC proxy filings until the conclusion of the performance period[53] and thus inclusion of any portion in 1992 would be inconsistent with the conventions under which the compensation of comparable executives was disclosed. Mr. Rosenbloom took the position that a ratable portion (i.e., 33 percent) of a Retained Executive's LTIP award should be treated as compensation earned in 1992.

For purposes of establishing reasonable compensation under section 280G(b)(4), we believe Ms. Meyer's position is untenable. Ms. Meyer would have us ignore compensatory payments to the Retained Executives that were generally nearly triple their annual base salaries, even though it is undisputed that the payments were earned over a 3-year period that began with 1992.[54] Further, Ms. Meyer's contention that the LTIP award was not vested until the completion of the 1992-94 performance period is belied by the evidence in this case. Mr. Pugh, whose employment was terminated effective April 15, 1994, received an LTIP based on his services in 1992 and 1993. Moreover, Ms. Meyer's

[53] See 17 C.F.R. sec. 229.402(b)(2)(iv)(C) (1993).

[54] Although the Retained Executives were not advised of the final terms of the LTIP until early 1993, their rights to an LTIP award were secured in the 1991 Employment Agreements, and certain of the Retained Executives participated in the development of the LTIP arrangements during 1992.

insistence on adherence to SEC disclosure conventions in this circumstance actually produces significant distortions. Specifically, Ms. Meyer would exclude any portion of the LTIP payout from the measurement of the Retained Executives' 1992 compensation, while at the same time she _includes_ in the 1992 compensation of her purportedly comparable executives any long-term incentive compensation payouts to them that happen to be disclosed for 1992. Such amounts are included in the 1992 compensation of her purportedly comparable executives even where they represent compensation for multiple years.[55] Thus, the version of conformity to SEC disclosure conventions that Ms. Meyer advocates systematically _inflates_ the 1992 compensation of her purported comparables in relation to her computation of the 1992 compensation of the Retained Executives, which generates a distorted comparison favoring petitioner's position. We accordingly reject it.

We believe that a clear and convincing showing of reasonable compensation for purposes of section 280G(b)(4) in this case must take some account of the substantial LTIP payouts made to the Retained Executives. Mr. Rosenbloom's determination to treat the

---

[55] For example, Ms. Meyer includes in the 1992 compensation of comparable executives Bielenski and Baisley, of W.W. Grainger, Inc., their long-term incentive compensation payouts in 1992 of $71,300 and $56,300, respectively, even though that company's proxy materials in the record disclose that the payouts covered 3 fiscal years (1990-92).

LTIP payouts as earned ratably over the 3-year period covered by the LTIP arrangements is reasonable, and we accept it.[56]  We accordingly shall treat the Retained Executives' 1992 compensation for purposes of determining its reasonableness in this case as including 33 percent of the LTIP payout covering the period 1992-94, except in the case of Mr. Pugh, whose LTIP payout covered only 1992 and 1993 and is therefore allocated 50 percent to 1992.

### (iii) 1991 SRP Benefits

Petitioner made payments of 1991 SRP Benefits and related interest totaling $4,191,053 to the Retained Executives in December 1992, under the terms of the 1991 Employment Agreements as amended in 1992.  Petitioner deducted these amounts in 1992 and takes the position herein that these amounts were fully earned by the Retained Executives in 1992 because, unlike the Retention Payments, they were not subject to clawback if a

---

[56] Ms. Meyer faults Mr. Rosenbloom's inclusion on a pro rata basis, arguing that if any amount of the LTIP payout is to be included in the Retained Executives' 1992 compensation, it should be 20, not 33, percent, because the LTIP arrangements weighted petitioner's financial performance in 1992, 1993, and 1994 at 20, 30, and 50 percent, respectively, in computing the amount of an LTIP award.

Without further evidence, we are not persuaded that ratable inclusion should be supplanted by a weighted inclusion corresponding to the weighting of petitioners's annual financial performance used in computing the LTIP award.

Retained Executive failed to complete the 4-year term of employment provided in the 1991 Employment Agreements as amended.

Ms. Meyer, for purposes of measuring the Retained Executives' 1992 compensation to test it for reasonableness, took a position similar to her position regarding the LTIP payouts; namely, that the 1991 SRP Benefits should be disregarded. Ms. Meyer would disregard this aggregate payment exceeding $4 million, made to the Retained Executives in 1992, on the grounds that the 1991 SRP Benefits were similar to the supplemental retirement plans of the purportedly comparable executives and that, under SEC disclosure conventions, the value of such supplemental retirement plans would not be included in the compensation of these comparable executives disclosed in the SEC proxy materials. Thus, inclusion of the 1991 SRP Benefits would inflate the Retained Executives' compensation in relation to the compensation of the comparable executives as reported in the SEC proxy materials, in Ms. Meyer's view. Mr. Rosenbloom treated the 1991 SRP Benefits identically to the Retention Payments, including a pro rata portion of the 1992 payment based on the number of years during the 1992-95 period that a Retained Executive remained employed with petitioner.

We conclude that neither expert has satisfactorily accounted for the 1991 SRP Benefits for purposes of assessing the reasonableness of the compensation of the Retained Executives.

Ms. Meyer's decision to disregard the payment cannot withstand scrutiny. Even if one were to accept Ms. Meyer's contention that the purportedly comparable executives she utilized had supplemental retirement plans similar to the Retained Executives', Ms. Meyer has not shown that the comparable executives received lump-sum payouts from these plans absent retirement or termination of employment, as occurred with the Retained Executives. Ms. Meyer claimed in trial testimony that many executives received payouts from supplemental retirement plans in 1992 in anticipation of an increase in Federal income tax rates in 1993, but her report contains no documentation that this occurred in the case of any of her purportedly comparable executives. We are unpersuaded that the lump-sum payouts of retirement benefits that the Retained Executives received in 1992 in the form of the 1991 SRP Benefits are so similar to the supplemental retirement plans of comparable executives that they can be ignored. To the contrary, the lump-sum payouts of the 1991 SRP Benefits, which ranged from 1.6 to more than 4 times a Retained Executive's 1992 base salary, were extraordinary in circumstance and amount. Any attempt to demonstrate the reasonableness of the Retained Executives' 1992 compensation that simply disregards the 1991 SRP Benefits falls far short of "clear and convincing", in our view.

While it is possible that some portion of the 1991 SRP Benefits is theoretically allocable to services provided in years other than 1992, petitioner has made no showing in this regard and instead has stipulated that the 1991 SRP Benefits were "earned" by the Retained Executives in 1992. In addition, the 1991 SRP Benefits were paid in 1992 and deducted in full by petitioner in that year. In these circumstances, giving due regard to the fact that petitioner bears a "clear and convincing" burden of proof, we find that the 1991 SRP Benefits are allocable in full to the Retained Executives' 1992 compensation.[57]

As earlier noted, supra note 28, respondent has conceded that a portion of the 1991 SRP Benefit paid to each Retained Executive should not be treated as contingent on a change of control under Q&A-24(c) of the proposed regulations. See sec. 1.280G-1, Q&A-24(c), Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5, 1989). Respondent maintains his position that the remainder of the 1991 SRP Benefits not excluded from parachute

_____

[57] As noted, we are also unpersuaded by Mr. Rosenbloom's position that the 1991 SRP Benefits should be allocated ratably over the years in the period 1992-95 in which a Retained Executive remained employed by petitioner, the same treatment he applied to the Retention Payments. Since the Retention Payments were subject to clawback while the 1991 SRP Benefits were not, we do not believe that the same treatment is appropriate for both types of payments. Moreover, the ratable allocation advocated by Mr. Rosenbloom conflicts with the parties' stipulation that the 1991 SRP Benefits were "earned" in 1992.

payment treatment under Q&A-24(c) are parachute payments.[58]  The
total 1991 SRP Benefits paid to each Retained Executive,[59] the
amount conceded by respondent as not contingent on a change in
control under Q&A-24(c) of the proposed regulations, and the
remainder that respondent contends is a parachute payment are as
follows:

|  | 1991 SRP Benefit | Noncontingent Amount | Remainder |
|---|---|---|---|
| Denny | $728,977 | $728,977 | 0 |
| Francis | 358,854 | 118,422 | $249,432 |
| Free | 804,477 | 596,260 | 208,217 |
| Garrett | 406,292 | 166,580 | 239,712 |
| Hite | 540,333 | 270,166 | 270,167 |
| Kurczewski | 367,304 | 143,249 | 224,055 |
| Richardson | 426,642 | 0 | 426,642 |
| Williams | 227,380 | 0 | 227,380 |

Because we conclude that the 1991 SRP Benefits should be
treated as compensation earned by the Retained Executives in
1992, those portions of the 1991 SRP Benefits conceded by
respondent as excluded from parachute payment treatment under
Q&A-24(c) are treated as part of the Retained Executives' 1992
compensation for purposes of assessing whether petitioner has
shown that the Retention Payments and the disputed 1991 SRP

---

[58] The parties have also stipulated that the amounts
denominated as "interest" paid with respect to the 1991 SRP
Benefits are deductible by petitioner in 1992 pursuant to sec.
163(a).

[59] Messrs. Brink, Pugh, and Thompson did not receive any
1991 SRP Benefits.

Benefits constitute reasonable compensation for purposes of section 280G(b)(4).

(iv)  Summary

Applying the foregoing determinations regarding the appropriate measure of the Retained Executives' 1992 compensation produces the amounts of 1992 compensation (excluding the Retention Payments and the disputed 1991 SRP Benefits) summarized in the following table:

| Retained Executive | Salary | STIP | LTIP[1] | Noncontingent 1991 SRP Benefit | Perquisites | Total |
|---|---|---|---|---|---|---|
| Brink | $216,720 | $123,748 | $197,400 | 0 | $89,129 | $626,997 |
| Denny | 400,000 | 252,000 | 441,095 | $728,977 | 0 | 1,822,072 |
| Francis | 156,000 | 71,136 | 115,737 | 118,422 | 33,738 | 495,033 |
| Free | 213,624 | 97,413 | 233,926 | 596,260 | 0 | 1,141,223 |
| Garrett | 270,900 | 154,413 | 0 | 166,580 | 0 | 591,893 |
| Hite | 245,100 | 139,953 | 220,030 | 270,166 | 0 | 875,249 |
| Kurczewski | 210,000 | 119,910 | 188,278 | 143,249 | 0 | 661,437 |
| Pugh | 207,174 | 118,090 | 95,388 | 0 | 0 | 420,652 |
| Richardson | 159,833 | 72,884 | 120,629 | 0 | 0 | 353,346 |
| Thompson | 236,844 | 135,001 | 205,127 | 0 | 0 | 576,972 |
| Williams | 193,500 | 88,236 | 148,665 | 0 | 0 | 430,401 |

[1] Prorated (1/3) portion of LTIP paid in 1995 with respect to services rendered during 1992-94, except for Mr. Pugh, whose proration for 1992 is one-half, because he rendered services only in 1992 and 1993.

### d.  Determination of Comparable Executives and Their Compensation

The experts differed regarding the choice of comparable executives and the determination of their compensation.  We next consider those differences in determining the extent to which petitioner has clearly and convincingly demonstrated the amount of compensation that was reasonable for the Retained Executives in 1992.

### (i)   Selection of Comparable Companies

The experts differed to some extent in their choices of companies they considered comparable to petitioner.  In her rebuttal report, Ms. Meyer used 18 companies she considered comparable, chosen from what she termed the "labor market" of the Retained Executives, which she defined somewhat crudely to include any company that "electricity runs through" and that met one of two additional criteria:  (i) The company was one for which the Retained Executives would be qualified to work, or (ii) it was one from which petitioner could draw executives to replace any of its own executives who decided to leave.  Mr. Rosenbloom's list was confined to 10 of the companies used by Ms. Meyer.  Mr. Rosenbloom considered only companies in the Value Line electrical equipment industry group, which group contained petitioner, thereby excluding electrical equipment manufacturers that were primarily defense contractors or tied to telecommunications, satellite, or other high technology industries.  These excluded high technology companies, he explained, were in less stable markets and thus not comparable to petitioner, whose business was based on a mature technology with products that changed only incrementally.  In line with this reasoning, Mr. Rosenbloom specifically criticized Ms. Meyer's use of four companies as comparables--General Instrument Corp., Litton Industries, Inc., Rockwell International Corp., and Varian Associates, Inc.--on the

grounds that all were substantially dissimilar from petitioner, either as primarily defense contractors or as high technology companies involved in an industry characterized by rapid technological change and growth.

We find Mr. Rosenbloom's critique persuasive. We are convinced that petitioner was engaged in a relatively mature industry characterized by incremental product changes, in distinct contrast to the high technology companies and defense contractors included as comparables by Ms. Meyer. As noted, the legislative history of section 280G(b)(4) specifically endorses the use of "similarly situated employees" working for "comparable employers" as a means of determining reasonable compensation. S. Rept. 99-313, underline supra at 919-920, 1986-3 C.B. (Vol. 3) at 919-920; H. Rept. 99-426, underline supra at 902, 1986-3 C.B. (Vol. 2) at 902. The differences highlighted by Mr. Rosenbloom persuade us that some of the companies used by Ms. Meyer are not "comparable employers". Finding Mr. Rosenbloom's analysis persuasive, we accept as comparable the 10 companies common to both experts' lists.[60] We reject as comparables the four companies noted above

---

[60] Those companies are Cooper Industries, Inc.; Emerson Electric Co.; General Signal Corp.; W.W. Grainger, Inc.; Honeywell, Inc.; Hubbell, Inc.; Johnson Controls, Inc.; Magnetek, Inc.; Thomas & Betts Corp.; and Westinghouse Electric Corp. However, Magnetek, Inc., is generally disregarded because its 1992 proxy materials in the record are not comparable in format to the other companies.

used by Ms. Meyer.  In the absence of a specific critique from Mr. Rosenbloom, we accept as comparable three of the remaining four companies used by Ms. Meyer but not by Mr. Rosenbloom; namely, AMP, Inc.; Baldor Electric Co.; and Danaher Corp.[61]

### (ii)  Selection of Comparable Executives and Their 1992 Compensation

The experts also differed in some instances in their choice of the executives of a comparable company that they deemed comparable to a given Retained Executive.  Upon review of their differences, we are persuaded that Ms. Meyer's choices were in general better reasoned.  For example, in the case of Mr. Denny, executive vice president and chief operating officer of petitioner, Mr. Rosenbloom chose the chief administrative officer of Honeywell, Inc., rather than the chief operating officer (relied upon by Ms. Meyer).  In the case of Mr. Kurczewski, corporate vice president, general counsel, and secretary of petitioner, Mr. Rosenbloom failed to include Messrs. Smith and Kennedy, who were vice president, general counsel, and secretary of General Signal and Johnson Controls, respectively, and Mr. Grayson, who was vice president and general counsel of Honeywell, Inc., all three of whom were included by Ms. Meyer.  Accordingly, we have generally deferred to Ms. Meyer's judgment concerning the

---

[61] The fourth, Raychem Corp., is disregarded because its 1992 proxy materials in the record are not comparable in format to the other companies'.

executives that were comparable to a specific Retained Executive in circumstances where the experts differed, except as specifically noted.

In a similar vein, even where the two experts agreed that a given executive was comparable to a Retained Executive, they frequently differed regarding the amount of 1992 compensation they attributed to the executive. In resolving this difference, we rely on the fact that Ms. Meyer demonstrated several instances where Mr. Rosenbloom's methodology diverged from standard practice and/or SEC disclosure conventions. In addition to Mr. Rosenbloom's treatment of perquisites in a manner inconsistent with SEC disclosure conventions (discussed above), Ms. Meyer convincingly demonstrates that Mr. Rosenbloom used nonstandard methods for valuing stock options, restricted stock, and the costs of defined benefit and defined contribution plans.[62] Frequently, though not always, Ms. Meyer's compensation figure for a comparable executive was less than Mr. Rosenbloom's figure, a position that disfavored the position of petitioner, her client. Overall, given the demonstrated idiosyncracies in Mr. Rosenbloom's methods of computing compensation, we defer to Ms.

---

[62] Respondent even concedes on brief that some of Mr. Rosenbloom's methodology in valuing compensation merits criticism.

Meyer's computations of a comparable executive's compensation in instances where the experts differ.

### e.   Range of Reasonable Compensation

Using their selection of comparable executives, each expert developed a range of compensation he or she considered reasonable.  For each Retained Executive, Mr. Rosenbloom computed a median of the compensation paid to the executives he deemed comparable.  He then chose a range of compensation he considered reasonable, based on his assessment of the duties and responsibilities of the Retained Executive compared with those of the comparable executives.  He considered reasonable compensation to fall within a narrow range of compensation; in several cases that narrow range contained the median figure, and in several cases the range was less than the median.  Thus, in several cases Mr. Rosenbloom found that the maximum reasonable compensation for a given Retained Executive was less than the median compensation of the executives he had selected as comparable.  Mr. Rosenbloom's limited view of what constitutes reasonable compensation makes it appear that a substantial number of the executives he deemed comparable executives were paid compensation in excess of a reasonable amount, calling into question the validity of the assumptions underlying his analysis.  At the very least Mr. Rosenbloom does not sufficiently explain his conclusion that reasonable compensation for the Retained Executives was an

amount near or less than the median of compensation of purportedly comparable executives. For this reason, we reject his conclusions regarding an appropriate range of reasonable compensation.

Ms. Meyer's approach was broadly similar, but her assumptions and conclusions reflect important differences. Like Mr. Rosenbloom, Ms. Meyer generated a list of purportedly comparable executives for each of the Retained Executives. However, in addition to computing the median of the range of compensation for each Retained Executive, she also computed the 75th and 90th percentiles. Based on her review of the duties and responsibilities of the Retained Executives' positions, and on petitioner's strategic need to maximize its retention of the Retained Executives, she believed that compensation was reasonable if it fell within the 75th and 90th percentile of the range of compensation paid to comparable executives. We agree with Ms. Meyer.

Petitioner's specialized circumstances at the time support Ms. Meyer's conclusion that petitioner would have expected to pay premium compensation to the Retained Executives. First of all, the Retained Executives were required to assume the duties of seven former executives, who left petitioner's employment following the change in control, including petitioner's chairman and chief executive officer, vice president and chief financial

officer, and corporate vice president-sales.  Moreover, we are persuaded that, as Schneider's management itself believed and the Retained Executives were aware, Schneider's options for obtaining senior management other than the Retained Executives to manage petitioner's operations were quite limited, which would tend to add a premium to what the Retained Executives would be paid, without regard to any leverage they possessed by virtue of their rights to the Termination Awards.  In addition, petitioner had been restructured from a publicly traded U.S. company to a wholly owned subsidiary of a foreign corporation.  As one Retained Executive testified, this increased various risks to petitioner's executives, resulting from, for instance, potential limits on upward mobility due to a preference for promoting foreign nationals, the increased likelihood of assignment overseas, and the potential clash of business cultures.  For these reasons, we find that petitioner should have expected to pay compensation at the upper end of the reasonable compensation range to retain the services of the Retained Executives.  Thus, we believe petitioner has shown clearly and convincingly that reasonable compensation for each Retained Executive would have been an amount not exceeding the 90th percentile of the range of compensation paid to comparable executives working for comparable companies.

f.    Reasonable Compensation Established for Each
      Retained Executive

Having concluded that 13 of the companies identified by the experts are comparable, that Ms. Meyer's selection of comparable executives within those companies and her computation of their 1992 compensation is more reliable than Mr. Rosenbloom's, and that reasonable compensation in 1992 for the Retained Executives would be an amount not exceeding the 90th percentile of the range of compensation paid to comparable executives in that year, we proceed to consider each Retained Executive and the amount of compensation shown to have been reasonable for him in 1992.

(i)    Mr. Brink

Ms. Meyer identified 13 executives in her rebuttal report that she considered comparable to Mr. Brink in 1992.  We conclude that three of those executives should be disregarded, as follows: Mr. Casey of Litton Industries, Inc., due to our previous determination that Litton Industries, Inc., is not comparable to petitioner; plus Mr. Reiland of Magnetek, Inc., and Mr. Everett of Raychem Corp., because as noted the proxy disclosures of those companies for 1992 are not comparable to the remaining companies, having been made prior to October 1992 regulatory changes governing disclosure formats.  We conclude that the 10 remaining executives are comparable.

For the reasons previously outlined, we use Ms. Meyer's computation of their 1992 compensation.  However, one significant

adjustment is required with respect to the treatment of long-term incentive plan compensation. In the case of one comparable executive (Mr. Bielinski), Ms. Meyer included the entire amount of a payout of long-term incentive compensation in his 1992 compensation because the payout occurred in 1992, even though the payment covered multiple years of services. Conversely, in the case of another comparable executive (Mr. Galvin), Ms. Meyer did not include any portion of a long-term incentive compensation payout, even though the proxy materials of Mr. Galvin's employer indicate that he received a $778,790 payout in 1993, paid with respect to 5 years of services including 1992. Consistent with our earlier analysis and conclusions concerning the LTIP payouts to the Retained Executive, we conclude that a ratable portion of a long-term incentive compensation payout should be included in compensation for any year on which the payout was based. We accordingly adjust the 1992 compensation of the comparable executives to do so, as described in greater detail in the footnotes to the following table, which summarizes the 1992 compensation of the executives determined to be comparable to Mr. Brink.

| Executive/Title | 1992 Compensation Per Ms. Meyer |
|---|---|
| Nagy, SVP & CFO, General Signal Corp. | $450,000 |
| Babcock, VP-Finance, Thomas & Betts Corp. | 437,000 |
| Galvin, SVP Finance & Controller, Emerson Elec. Co. | [1]473,300 |
| Rowell, EVP-CFO, Hubbell, Inc. | 783,500 |
| Roell, VP-CFO, Johnson Controls, Inc. | [2]537,200 |
| Cross, SVP-Finance, Cooper Indus., Inc. | 603,500 |
| Bielinski, VP & CFO, W.W. Grainger, Inc. | [3]594,800 |
| Savidge, EVP-CFO, AMP, Inc. | 400,700 |
| Davis, CFO, Secy, Baldor Elec. Co. | 215,900 |
| Allender, SVP & CFO, Danaher Corp. | 519,000 |

[1] Added to the total compensation computed by Ms. Meyer is 20 percent (or approximately $155,800) of a long-term incentive compensation plan payout in 1993 of $778,790, which the Emerson Elec. Co. proxy materials in the record disclose was paid with respect to a 5-year performance period that included 1992.

[2] Ms. Meyer's figure includes a long-term incentive compensation plan payout of $18,700 which, according to the Johnson Controls, Inc., proxy materials in the record, is the 1992 portion of a long-term incentive performance award covering the period 1992-94.

[3] Excludes $47,800 of the total compensation computed by Ms. Meyer, representing 67 percent of a $71,300 long-term incentive compensation plan payout in 1992 that Ms. Meyer included in full, since the 1992 payout, according to the W.W. Grainger, Inc., proxy materials in the record, covered the company's 3 fiscal years 1990-92.

The 90th percentile of this range of compensation is $621,500. Accordingly, reasonable compensation for Mr. Brink in 1992 would have been an amount not exceeding $621,500. Mr. Brink's 1992

compensation, excluding the Retention Payment,[63] was $626,997.
Consequently, petitioner has failed to show that any portion of
the Retention Payment deducted with respect to Mr. Brink in 1992
constituted reasonable compensation for purposes of section
280G(b)(4).

(ii) Mr. Denny

Ms. Meyer identified 10 executives in her rebuttal report
that she considered comparable to Mr. Denny in 1992.  We conclude
that Mr. Brann of Litton Industries, Inc., should be disregarded
because as noted we believe that company is not comparable to
petitioner.  We conclude that the remaining nine executives are
comparable.[64]

---

[63] Respondent concedes that the entire amount of the 1991
SRP Benefit paid to Mr. Brink and deducted by petitioner in 1992
was not contingent on a change in control under Q&A-24(c) of sec.
1.280G-1, Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5,
1989).

[64] Included among these nine is an executive from Rockwell
International Corp., a company with respect to which we
previously accepted Mr. Rosenbloom's judgment that it was not
comparable to petitioner.  However, Mr. Rosenbloom concedes that
Mr. Davis of Rockwell International Corp., who headed an
automation equipment subsidiary, is comparable to Mr. Denny, and
we accordingly accept Ms. Meyer's use of that executive as a
comparable for Mr. Denny.
In addition, Mr. Rosenbloom raised specific objections to
Ms. Meyer's use of certain other comparable executives for Mr.
Denny.  On balance, we find these objections immaterial.  If one
took the 90th percentile of the 1992 compensation of the
executives treated by Mr. Rosenbloom as comparable to Mr. Denny,
that figure would be higher than the 90th percentile of the 1992
compensation of the executives treated as comparable by Ms.
Meyer.

For the reasons previously outlined, we use Ms. Meyer's computation of their 1992 compensation. However, an adjustment for long-term incentive plan compensation, analogous to that made for some of Mr. Brink's comparables, is required. We accordingly adjust the 1992 compensation of Mr. Suter of Emerson Electric Co. and Mr. Davis of Baldor Electric Co. to include in their 1992 compensation a ratable portion of long-term incentive compensation paid to them in 1993. The following table summarizes the 1992 compensation of the executives determined to be comparable to Mr. Denny.

| Executive/Title | 1992 Compensation Per Ms. Meyer |
|---|---|
| Moore, Pres., Elec. Div., Thomas & Betts Corp. | $1,211,400 |
| Suter, Pres. & COO, Emerson Elec. Co. | [1]1,278,800 |
| Bonsignore, EVP & COO, Honeywell, Inc. | 1,135,700 |
| Moore, EVP & COO, Honeywell, Inc. | 1,159,000 |
| Riley, Pres. & COO, Cooper Indus.,Inc. | 768,900 |
| Clark, EVP, Inds., Westinghouse Elec. Corp. | 645,700 |
| Davis, EVP & COO, Rockwell Intl. Corp. | [2]832,100 |
| Marley, Pres. & COO, AMP, Inc. | 570,300 |
| Qualls, Pres. & COO, Baldor Elec. Co. | 511,900 |

[1] Added to the total compensation computed by Ms. Meyer is 20 percent (or approximately $378,800) of a long-term incentive compensation plan payout in 1993 of $1,894,043, which the Emerson Elec. Co. proxy materials in the record disclose was paid with respect to a 5-year performance period that included 1992.

[2] Added to the total compensation computed by Ms. Meyer is 33 percent (or approximately $135,200) of a long-term incentive compensation plan payout in 1993 of $409,605, which the Rockwell Intl. Corp. proxy materials in the record disclose was paid with respect to a 3-year performance period that included 1992.

The 90th percentile of this range of compensation is $1,224,880. Accordingly, reasonable compensation for Mr. Denny in 1992 would have been an amount not exceeding $1,224,880. Mr. Denny's 1992 compensation, excluding the Retention Payment and disputed 1991 SRP Benefit, was $1,822,072. Consequently, petitioner has failed to show that any portion of the Retention Payment and disputed 1991 SRP Benefit deducted with respect to Mr. Denny in 1992

constituted reasonable compensation for purposes of section 280G(b)(4).

### (iii) Mr. Kurczewski

Ms. Meyer identified six executives in her rebuttal report that she considered comparable to Mr. Kurczewski in 1992. We conclude that Mr. Durmit of General Instrument Corp. should be disregarded because as noted we believe that company is not comparable to petitioner. We conclude that the remaining five executives are comparable.

For the reasons previously outlined, we use Ms. Meyer's computation of their 1992 compensation. However, an adjustment is required to correct Ms. Meyer's computation of the 1992 compensation of Mr. Baisley of W.W. Grainger, Inc. Ms. Meyer included in Mr. Baisley's 1992 compensation the entire amount of a long-term incentive compensation payout made in 1992, even though the payout covered services rendered in 3 fiscal years (1990-92). Accordingly, a ratable portion of the payout is removed from 1992 compensation, as described in greater detail in a footnote to the following table, which summarizes the 1992 compensation of the executives determined to be comparable to Mr. Kurczewski.

| Executive/Title | 1992 Compensation Per Ms. Meyer |
|---|---|
| Baisley, VP, GC, W.W. Grainger, Inc. | [1]$468,100 |
| Davies, GC, Secy, Hubell, Inc. | 292,400 |
| Smith, VP, GC & Secy General Signal Corp. | 270,300 |
| Grayson, VP, GC, Honeywell, Inc. | 952,700 |
| Kennedy, VP, GC & Secy Johnson Controls, Inc. | [2]475,900 |

[1] Excludes $37,800 of the total compensation computed by Ms. Meyer, representing 67 percent of a $56,300 long-term incentive compensation plan payout in 1992 that Ms. Meyer included in full, since the 1992 payout, according to the W.W. Grainger, Inc., proxy materials in the record, covered the company's 3 fiscal years 1990-92.

[2] Ms. Meyer's figure includes a long-term incentive compensation plan payout of $31,100 which, according to the Johnson Controls, Inc., proxy materials in the record, is the 1992 portion of a long-term incentive performance award covering the period 1992-94.

The 90th percentile of this range of compensation is $761,980. Accordingly, reasonable compensation for Mr. Kurczewski in 1992 would have been an amount not exceeding $761,980. Mr. Kurczewski's 1992 compensation, excluding the Retention Payment and disputed 1991 SRP Benefit, was $661,437. Because reasonable compensation for Mr. Kurczewski in 1992 exceeded his 1992 compensation (exclusive of the Retention Payment and disputed 1991 SRP Benefit) by $100,543, this excess constitutes the amount of Mr. Kurczewski's Retention Payment and disputed 1991 SRP Benefit that petitioner has shown by clear and convincing evidence was reasonable compensation in 1992 for purposes of section 280G(b)(4).

(iv) <u>Messrs. Garrett, Richardson, Thompson, and
Williams</u>

Ms. Meyer identified 17 executives in her rebuttal report
that she considered comparable to petitioner's heads of operating
divisions; namely, Messrs. Garrett, Richardson, Thompson, and
Williams, in 1992.  We conclude that eight of those executives
should be disregarded, as follows:  Mr. Rosso of Honeywell, Inc.,
and Mr. Claramunt of Danaher Corp. because the description of
those executives' duties in 1992 in the proxy disclosure
materials in the record conflict with Ms. Meyer's description of
their duties in 1992; Messrs. Jeney, Dundon, and Scherzi of
Magnetek, Inc., because the proxy disclosures of that company for
1992 are not comparable to the remaining companies, having been
made prior to October 1992 regulatory changes governing
disclosure formats; and Messrs. Drendel, Bunker, and Krisbergh of
General Instrument Corp., because as noted we believe that
company is not comparable to petitioner.

Moreover, Mr. Rosenbloom specifically objected to Ms.
Meyer's use as comparables of two executive vice presidents of
Johnson Controls, Inc., on the grounds that they were responsible
for business segments with several billion dollars in annual
revenues and therefore not comparable to petitioner's heads of
operating divisions.  We are persuaded by Mr. Rosenbloom on this
point and find that Messrs. Lewis and Barth of Johnson Controls,
Inc., should be disregarded.

We conclude that the seven remaining executives are comparable.  For the reasons previously outlined, we use Ms. Meyer's computation of their 1992 compensation.  However, an adjustment is required to correct Ms. Meyer's computation of the 1992 compensation of Mr. Keyser of W.W. Grainger, Inc.  Ms. Meyer included in Mr. Keyser's 1992 compensation the entire amount of a long-term incentive compensation payout made in 1992, even though the payment covered services rendered in 3 fiscal years (1990-92).  Accordingly, a ratable portion of the payout is removed from 1992 compensation, as described in greater detail in a footnote to the following table, which summarizes the 1992 compensation of the executives determined to be comparable to petitioner's heads of operating divisions.

| Executive/Title | 1992 Compensation Per Ms. Meyer |
|---|---|
| Bonke, Group VP, General Signal Corp. | $393,000 |
| Pluff, Group VP, Hubbell, Inc. | 416,200 |
| Paquette, Div. Pres., Thomas & Betts Corp. | 327,500 |
| Pileggi, Div. Pres., Thomas & Betts Corp. | 262,600 |
| Chenoweth, Sr. Corp. VP-Intl., Honeywell, Inc. | 712,600 |
| Keyser, EVP, W.W. Grainger, Inc. | [1]829,500 |
| Hassan, VP-Global Interconn. Sys., AMP, Inc. | 250,600 |

[1] Excludes $77,200 of the total compensation computed by Ms. Meyer, representing 67 percent of a $115,231 long-term incentive compensation plan payout in 1992 that Ms. Meyer included in full, since the 1992 payout, according to the W.W. Grainger, Inc., proxy materials in the record, covered the company's 3 fiscal years 1990-92.

The 90th percentile of this range of compensation is $759,360. Accordingly, reasonable compensation for petitioner's heads of operating divisions in 1992 would have been an amount not exceeding $759,360.

### (aa) Mr. Garrett

Mr. Garrett's 1992 compensation, excluding the Retention Payment and disputed 1991 SRP Benefit, was $591,893. Because reasonable compensation for Mr. Garrett in 1992 exceeded his 1992 compensation (exclusive of the Retention Payment and disputed 1991 SRP Benefit) by $167,467, this excess constitutes the amount of Mr. Garrett's Retention Payment and disputed 1991 SRP Benefit

that petitioner has shown by clear and convincing evidence was reasonable compensation in 1992 for purposes of section 280G(b)(4).[65]

### (bb)  Mr. Richardson

Mr. Richardson's 1992 compensation, excluding the Retention Payment and disputed 1991 SRP Benefit, was $353,346.  Because reasonable compensation for Mr. Richardson in 1992 exceeded his 1992 compensation (exclusive of the Retention Payment and disputed 1991 SRP Benefit) by $406,014, this excess constitutes the amount of Mr. Richardson's Retention Payment and disputed 1991 SRP Benefit that petitioner has shown by clear and convincing evidence was reasonable compensation in 1992 for purposes of section 280G(b)(4).

---

[65] Respondent also argues that Mr. Garrett's Retention Payment (but not his 1991 SRP Benefit) cannot be reasonable compensation for services because it is a severance payment within the meaning of Q&A-44 of sec. 1.280G-1, Proposed Income Tax Regs., 54 Fed. Reg. 19407 (May 5, 1989).  We need not address this contention, however, because the disputed 1991 SRP Benefit received by Mr. Garrett, which respondent concedes is not a severance payment, equaled $239,712.  We conclude above that petitioner has established that $167,467 of the (combined) Retention Payment and 1991 SRP Benefit paid to Mr. Garrett in 1992 constituted reasonable compensation.  Amounts above this figure are not reasonable compensation for 1992 services. Accordingly, $167,467 of the $239,712 1991 SRP Benefit is reasonable compensation, but the remainder of the 1991 SRP Benefit and all of the Retention Payment is not.  Because Mr. Garrett's Retention Payment would not in any event constitute reasonable compensation, we need not decide whether it is also not reasonable compensation because it is a severance payment.

(cc)  Mr. Thompson

Mr. Thompson's 1992 compensation, excluding the Retention Payment,[66] was $576,972.  Because reasonable compensation for Mr. Thompson in 1992 exceeded his 1992 compensation (exclusive of the Retention Payment) by $182,388, this excess constitutes the amount of Mr. Thompson's Retention Payment that petitioner has shown by clear and convincing evidence was reasonable compensation in 1992 for purposes of section 280G(b)(4).

(dd)  Mr. Williams

Mr. Williams's 1992 compensation, excluding the Retention Payment and disputed 1991 SRP Benefit, was $430,401.  Because reasonable compensation for Mr. Williams in 1992 exceeded his 1992 compensation (exclusive of the Retention Payment and disputed 1991 SRP Benefit) by $328,959, this excess constitutes the amount of Mr. Williams's Retention Payment and disputed 1991 SRP Benefit that petitioner has shown by clear and convincing evidence was reasonable compensation in 1992 for purposes of section 280G(b)(4).

(v)  Messrs. Francis, Free, Hite, and Pugh

With respect to Messrs. Francis, Free, Hite, and Pugh, Ms. Meyer was unable to find any SEC proxy disclosures of compensation for comparable executives; i.e., for a chief

---

[66] Mr. Thompson did not receive a 1991 SRP Benefit.

technology officer (Mr. Francis), treasurer (Mr. Free), director of human resources (Mr. Hite), or sales and marketing executive (Mr. Pugh).[67]  Consequently, to demonstrate the reasonableness of the foregoing executives' compensation, she used data from the executive compensation surveys that we have rejected.  Because we have concluded that the survey data does not satisfy the requirements of comparability, Ms. Meyer's effort to show reasonableness through this technique must fail.

Mr. Rosenbloom encountered the same problem and solved it by using the assumption that, since SEC proxy materials generally disclose the compensation of the five most highly compensated officers, comparable executives to the foregoing Retained Executives must have earned less than the lowest paid officer disclosed in proxy materials of a comparable company.[68]  Ms. Meyer criticized this approach by arguing that although the SEC proxy rules require disclosure of the compensation paid to a company's chief executive and four most highly compensated

---

[67] Although Mr. Rosenbloom treated Mr. Pugh as the head of an operating division, Ms. Meyer contends that this categorization was erroneous because Mr. Pugh had sales and marketing responsibilities.  Consistent with our previous conclusion that Ms. Meyer demonstrated superior judgment in comparing the duties and responsibilities of the Retained Executives with those of comparable executives, we accept Ms. Meyer's judgment that Mr. Pugh cannot appropriately be compared to the head of an operating division.

[68] Because Mr. Rosenbloom treated Mr. Pugh as equivalent to the head of an operating division, see supra note 67, he did not apply this assumption to Mr. Pugh.

"executive officers", corporations have wide latitude in defining their "executive officers". See 17 C.F.R. secs. 229.402(a)(3), 240.3b-7 (2000). According to Ms. Meyer, for a variety of internal reasons, a company's four most highly compensated executive officers may not in fact be that company's four most highly compensated employees. We find Ms. Meyer's criticism persuasive.

In light of (i) our conclusion that Ms. Meyer's effort to demonstrate the reasonableness of the compensation of Messrs. Francis, Free, Hite, and Pugh is based on the executive compensation surveys that are not comparable, and (ii) the fact that the percentage increase in the pre- and postacquisition compensation of Messrs. Francis, Free, Hite, and Pugh was 178, 367, 245, and 384 percent, respectively, we conclude that petitioner has failed to establish clearly and convincingly that any portion of the Retention Payments or disputed 1991 SRP Benefits of these executives, deducted by petitioner in 1992, constituted reasonable compensation for purposes of section 280G(b)(4)(A).

To reflect the foregoing,

Decision will be entered under Rule 155.